**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:                                                         Case No. 06-11877-BKC-AJC

FALCON AIR EXPRESS, INC.,                                      Chapter 11

            Debtor.
_____/

---

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FIRST AMENDED
CHAPTER 11 PLAN OF REORGANIZATION FOR FALCON AIR EXPRESS, INC.
JOINTLY PROPOSED BY KENNETH A. WELT, CHAPTER 11 TRUSTEE, AND
SKYVALUE AIRLINES, INC.**

---

Dated: February 9, 2007

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
MARCH 1, 2007. IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE
RECEIVED BY THE BANKRUPTCY COURT ON OR BEFORE THAT DATE.**

---

Jointly Submitted by:

KATZ BARRON SQUITERO FAUST          -and-     RICE PUGATCH ROBINSON & SCHILLER, P.A.
Frank P. Terzo, Esq.                          Lisa M. Schiller, Esq.
(Fla. Bar No. 906263)                         (Fla. Bar No. 984426)
Nathan G. Mancuso, Esq.                       101 NE 3rd Avenue, Suite 1800
(Fla. Bar No. 174254)                         Tower 101
2699 South Bayshore Drive, 7th Floor          Ft. Lauderdale, FL 33301
Miami, Florida 33133                          Telephone: (954) 462-8000
Telephone: (305) 856-2444                     Facsimile: (954) 462-4300
Facsimile: (305) 285-9227

*ATTORNEYS FOR KENNETH A. WELT,*             *ATTORNEYS FOR SKYVALUE*
*CHAPTER 11 TRUSTEE FOR FALCON*              *AIRLINES, INC.*
*AIR EXPRESS, INC.*

## TABLE OF CONTENTS

**ARTICLE I INTRODUCTION** ................................................................... **1**

  **A.**   Summary of Transactions and Distributions under the Plan ................................ 1

  **B.**   Filing of Falcon Air's Chapter 11 Case ................................................ 3

  **C.**   Purpose of Disclosure Statement ...................................................... 4

  **D.**   Disclaimers ............................................................................ 4

  **E.**   Consolidated Hearing on Approval of the Disclosure Statement and Confirmation of the Plan ........................................................................... 6

  **F.**   Sources of Information ................................................................. 6

**ARTICLE II EXPLANATION OF CHAPTER 11** ........................................... **7**

  **A.**   Overview of Chapter 11 ............................................................... 7

  **B.**   Plan of Reorganization ................................................................ 7

**ARTICLE III VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS** ...... **8**

  **A.**   Creditors Entitled to Vote ............................................................. 9

  **B.**   Bar Date for Filing Proofs of Claim ................................................. 10

  **C.**   Definition of Impairment ............................................................ 10

  **D.**   Classes Entitled to Vote on the Plan ................................................ 11

  **E.**   Vote Required for Class Acceptance ................................................ 11

  **F.**   Confirmation of Plan ................................................................. 12

  **G.**   Requirements for Confirmation of the Plan ......................................... 12

  **H.**   Acceptances Necessary to Confirm the Plan ........................................ 14

  **I.**   Cramdown ............................................................................ 14

**ARTICLE IV BACKGROUND OF THE DEBTOR** ........................................ **15**

  **A.**   Description of Falcon Air's Business ................................................ 15

      1.   Background ...................................................................... 15

      2.   Government Regulation ......................................................... 15

  **B.**   Corporate Information ................................................................ 15

      1.   The Debtor ..................................................................... 15

      2.   Existing Equity Structure ....................................................... 15

      3.   Current Management and Directors of Falcon Air ............................... 16

  **C.**   Events Leading to Chapter 11 Filing ................................................ 16

  **D.**   Financial Information ................................................................. 16

  **E.**   Claims Against the Estate ............................................................ 17

      1.   General Unsecured Claims ...................................................... 17

      2.   Secured and Trust Fund Claims ................................................. 17

          a.  IRS Claim ................................................................. 17

          b.  DOJ Trust Fund Claims .................................................... 18

          c.  Other Secured Claims ..................................................... 19

      3.   Administrative Claims .......................................................... 19

          a.  Ordinary Course Liabilities and Administrative Trade Claims ............... 19

          b.  JetGlobal Post-Petition Financing .......................................... 20

          c.  Cure Claims ............................................................... 21

d. Professional Claims ................................................................ 21
4. Priority Claims ............................................................................ 21
a. Priority Tax Claims ........................................................... 21
b. Priority Non-Tax Claims..................................................... 22
c. Airport User Fees ............................................................. 22
F. Debtor's Assets ................................................................................. 22
1. Aircraft Operating Certificates ............................................. 23
2. Aircraft Leases ......................................................................... 23
3. Miami Airport Use Agreement ............................................... 23
4. Leased Facilities ....................................................................... 24
5. Inventory and Parts .................................................................. 24
6. Accounts Receivable................................................................. 25
7. Cash and Certificates of Deposit............................................ 25
8. Causes of Action ....................................................................... 25

**ARTICLE V CAUSES OF ACTION** ................................................................... **26**
A. State/Common Law Causes of Action ............................................ 26
B. Avoidance Actions ........................................................................... 28

**ARTICLE VI POST-PETITION OPERATIONS AND SIGNIFICANT EVENTS
DURING CHAPTER 11 CASE** ....................................................................... **29**
A. Post-Petition Operations ................................................................. 29
B. First Day Orders.............................................................................. 29
C. Creditors' Committee....................................................................... 29
D. Employment of Professionals ......................................................... 30
E. Schedules and Statement of Financial Affairs .............................. 30
F. JetGlobal DIP Credit Facility......................................................... 30
G. IRS Cash Collateral Agreements ................................................... 31
H. Aeropostal Settlement Agreement .................................................. 31
I. Icon Agreement and First Chapter 11 Plan.................................. 33
J. SkyValue Stock Issuance and Plan Funding Agreement ............... 33

**ARTICLE VII SUMMARY DESCRIPTION OF THE PLAN** ................................. **34**
A. Introduction...................................................................................... 34
B. Designation of Claims and Equity Interests/ Impairment............. 34
C. Treatment of Unclassified Claims .................................................. 35
1. Allowed Administrative Claims. ............................................. 35
2. Ordinary Course Liabilities.................................................... 36
3. Professional Claims. ................................................................ 36
4. U.S. Trustee Fees..................................................................... 36
5. Priority Tax Claims.................................................................. 36
6. Administrative Claims Bar Date. ........................................... 37
D. Treatment of Classified Claims and Interests ............................... 37
1. Class 1: Priority Non-Tax Claims (Unimpaired). ................. 38
2. Class 2: IRS Secured and Priority Claims (Impaired). ........ 38
3. Class 3: DOJ Trust Fund Claims (Impaired). ...................... 38
4. Class 4: DFAS Secured Claim (Unimpaired). ....................... 39

|  | 5. | Class 5:  USDA Secured Claim (Unimpaired). | 39 |
|  | 6. | Class 6: Security Deposit Claims (Unimpaired). | 39 |
|  | 7. | Class 7:  Secured Financing Claims (Unimpaired). | 39 |
|  | 8. | Class 8:  JetGlobal Secured DIP Financing Claim (Impaired). | 39 |
|  | 9. | Class 9: Other Secured Claims (Unimpaired). | 40 |
|  | 10. | Class 10: General Unsecured Claims (Impaired). | 40 |
|  | 11. | Class 11: Equity Interests (Impaired). | 40 |
| E. | | Assumption and Rejection of Executory Contracts under the Plan | 41 |
|  | 1. | Assumption. | 41 |
|  | 2. | Rejection. | 41 |
|  | 3. | Rejection Claims. | 41 |
|  | 4. | Cure Payments. | 41 |
| F. | | Exculpation, Injunction and Automatic Stay | 42 |
|  | 1. | Discharge. | 42 |
|  | 2. | Binding Effect. | 43 |
|  | 3. | Stay. | 43 |
|  | 4. | Exculpation. | 43 |
|  | 5. | Injunction. | 43 |
| **ARTICLE VIII MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN** | | | **44** |
| A. | | Stock Issuance and Plan Funding Agreement. | 44 |
| B. | | Vesting of Assets in Reorganized Falcon Air and Continued Corporate Existence. | 44 |
| C. | | Management of Reorganized Debtor. | 44 |
| D. | | Creation of the Liquidating Trust. | 45 |
|  | 1. | General. | 45 |
|  | 2. | Transfer of Excluded Assets to the Liquidating Trust. | 45 |
|  | 3. | Designation of Liquidating Trustee. | 45 |
|  | 4. | Purpose of Liquidating Trust. | 46 |
|  | 5. | Compensation of Liquidating Trustee and Professionals. | 46 |
|  | 6. | Liquidating Trust Reserve. | 46 |
| **ARTICLE IX FEASIBILITY** | | | **47** |
| A. | | Plan Payments | 47 |
| B. | | Reorganized Debtor and Business Plan | 47 |
| **ARTICLE X RISK FACTORS** | | | **48** |
| A. | | Failure to Confirm or Consummate the Plan | 48 |
| B. | | Allowed Claims Estimates May Be Incorrect | 48 |
| C. | | Competitive Conditions in the Airline Industry | 49 |
| D. | | Increase in Oil Prices or Oil Shortages | 49 |
| E. | | Regulation of Airline Industry | 49 |
| **ARTICLE XI ALTERNATIVES TO PLAN AND BEST INTERESTS OF CREDITORS** | | | **49** |
| A. | | Dismissal | 50 |
| B. | | Chapter 7 Liquidation | 50 |

     C.     Alternative Plan ........................................................................................... 51

**ARTICLE XII TAX CONSIDERATIONS** ............................................................. **51**
     A.     In General.................................................................................................... 51
     B.     Federal Income Tax Consequences to the Debtor .............................. 52
     C.     Federal Income Tax Consequences to Creditors ................................ 53
     D.     Holders of Allowed Equity Interests.................................................... 54
     E.     Holders of Disputed Claims.................................................................. 54
     F.     Information Reporting and Backup Withholding ................................ 54
     G.     Importance of Obtaining Professional Tax Assistance ....................... 55

**ARTICLE XIII CONCLUSION**............................................................................... **55**

**EXHIBITS:**

**Exhibit 1:**  **First Amended Chapter 11 Plan of Reorganization**
**Exhibit 2:**  **Falcon Air Directors'** *Curricula Vitae*
**Exhibit 3:**  **Past-Due Accounts Receivable**
**Exhibit 4:**  **Schedules of Potentially Avoidable and Recoverable Pre-Petition Transfers**

## ARTICLE I
## INTRODUCTION

Kenneth A. Welt, Chapter 11 Trustee (the "Trustee") for Falcon Air Express, Inc. ("Falcon Air" or the "Debtor"), and SkyValue Airlines, Inc. ("SkyValue" and, together with the Trustee, the "Proponents") jointly submit this Disclosure Statement pursuant to Bankruptcy Code section 1125 in support of the First Amended Chapter 11 Plan of Reorganization for Falcon Air Express, Inc. Jointly Proposed by Kenneth A. Welt, Chapter 11 Trustee, and SkyValue Airlines, Inc., as it may be amended (the "Plan"). A true and correct copy of the Plan is attached hereto as Exhibit 1.

This Disclosure Statement sets forth certain information regarding Falcon Air's pre-petition operations and financial history, events leading to Falcon Air's chapter 11 bankruptcy filing, significant events that have occurred during the Chapter 11 Case, and the means for implementing a restructuring of Falcon Air's liabilities through the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan and Liquidating Trust described herein. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures and requirements for voting on the Plan.[1]

### A.    Summary of Transactions and Distributions under the Plan[2]

THE FOLLOWING IS INTENDED TO BE A BRIEF SUMMARY OF THE TREATMENT OF CREDITORS UNDER THE PLAN. IT IS NOT INTENDED TO BE A SUMMARY OF ALL THE PROVISIONS OF THE PLAN, AND SHOULD BE READ IN CONJUNCTION WITH THE ENTIRE PLAN.

The Plan provides for the continued operation of Falcon Air as a reorganized business owned and controlled by SkyValue after the stock acquisition contemplated under the Plan and Stock Issuance and Plan Funding Agreement. The Proponents believe that the Plan is in the best interests of Creditors and, accordingly, urge all Creditors who are entitled to vote on the Plan to vote in favor of the Plan.

Falcon Air's existing common stock will be canceled and extinguished as of the Effective Date and 100% of Reorganized Falcon Air's capital stock will be issued to SkyValue for a cash purchase price of $3.3 million plus the amounts of (i) $202,000 in respect of the rejection of the Lakes Edge Lease and (ii) $350,000 earmarked for payment of Allowed Administrative Claims.

---

[1]    Except as otherwise provided herein, capitalized terms used herein shall have the meanings ascribed to them in the Plan. Any capitalized term used in this Disclosure Statement that is not defined in the Plan or this Disclosure Statement shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable.

[2]    The description of the Plan contained in this section of the Disclosure Statement is a summary description only and qualified by the terms of the Plan itself. Creditors and parties in interest should read the Plan carefully for a complete description of its terms and transactions that will be implemented thereunder.

Accordingly, SkyValue will emerge as the owner of Reorganized Falcon Air as of the Effective Date.

All of Falcon Air's assets other than causes of action, accounts receivable, claims relating to certain Falcon Air-owned aircraft engines held by third parties, cash and cash equivalents, and Falcon Air's stock interest in its wholly-owned subsidiaries Majel Aircraft Leasing Corporation ("Majel") and Falcon Air Express de Venezuela, and certain other excluded assets will vest in Reorganized Falcon Air as of the Effective Date, while the aforementioned excluded assets will be transferred to a liquidating trust created for the benefit of general unsecured creditors under the Plan (though payments received by the Liquidating Trustee in respect of the Outstanding Aeropostal Receivable will be paid to the IRS in partial satisfaction of its Allowed Class 2 Claim, subject to certain conditions set forth in Section 3.3 of the Plan).

Distributions to Holders of Allowed Claims and the anticipated recoveries to Allowed Creditors under the Plan are summarized below:

| Class | Type | Treatment |
|-------|------|-----------|
| N/A | Administrative Claims | Allowed Administrative Claims will be paid in full on Effective Date or such later date that any such Claim becomes Allowed. |
| N/A | Priority Tax Claims (excluding IRS Priority Claim) | Allowed Priority Tax Claims will be paid in full on Effective Date or such later date that any such Claim becomes Allowed. |
| 1 | Priority Non-Tax Claims (Unimpaired) | Allowed Class 1 Claims will be paid in full on Effective Date or such later date that any such Claim becomes Allowed. |
| 2 | IRS Secured and Priority Claims (Impaired) | The IRS will receive (i) all Cash in the Estate (including SkyValue Cash Consideration) on Effective Date after payment of Allowed Administrative Claims, Allowed Priority Claims, the Allowed USDA Secured Claim and $200,000 earmarked to fund the Liquidating Trust; and (ii) all payments received by the Liquidating Trustee in respect of the Outstanding Aeropostal Receivable, subject to certain conditions as described in the Plan, in full and complete satisfaction of its Allowed Secured and Priority Claims.  The IRS has waived any deficiency claim.[3] |
| 3 | DOJ Trust Fund Claims (Impaired) | The DOJ, on behalf of all Allowed Class 3 Claims, will receive a Cash distribution from the IRS (payable solely out of the consideration paid to the IRS under the Plan in an amount to be agreed upon between the IRS and DOJ) and any available Customs Bond proceeds, plus an Allowed Class 10 General Unsecured Claim for the deficiency. |

---

[3]      The treatment of the IRS Claim and DOJ Trust Fund Claims under the Plan assumes that the Trustee reaches an agreement with the IRS and DOJ.

| 4 | DFAS Secured Claim (Unimpaired) | DFAS will be entitled to exercise any valid right of setoff in full satisfaction of its Allowed Secured Claim. |
|---|---|---|
| 5 | USDA Secured Claim (Unimpaired) | USDA will be paid in full on Effective Date or such later date that its Secured Claim becomes Allowed in full satisfaction of its Secured Claim. |
| 6 | Security Deposit Claims (Unimpaired) | Holders of Allowed Security Deposit Claims shall receive and retain their security deposits in full satisfaction of their Secured Claims. |
| 7 | Secured Financing Claims (Unimpaired) | Holders of Allowed Secured Financing Claims shall either retain their liens and be paid by the Reorganized Debtor in accordance with the terms of their underlying security documents or receive their collateral in full satisfaction of their Secured Claims. |
| 8 | JetGlobal Secured DIP Financing Claim (Impaired) | JetGlobal will receive the full amount of its Allowed Secured Claim, if any, on the date that such Claim becomes Allowed. |
| 9 | Other Secured Claims (Unimpaired) | Holders of Allowed Other Secured Claims shall either be paid in full, retain their liens and be paid in accordance with the terms of their underlying security documents, or receive their collateral in full satisfaction of their Secured Claims. |
| 10 | General Unsecured Claims (Impaired) | Holders of Allowed General Unsecured Claims will receive pro-rata distribution from Liquidating Trust Assets. **Anticipated recovery is 2-3% of Allowed Claims.** |
| 11 | Equity Interests (Impaired) | Equity Interests shall be canceled and extinguished as of the Effective Date. |

Under the Plan, the Cash consideration paid by SkyValue plus any available Cash on hand on the Effective Date will be used to pay (or reserve for) Allowed Administrative Claims, Allowed Priority Claims, the Allowed USDA Secured Claim, the amount of $200,000 to fund the Liquidating Trust and the Effective Date payment in respect of the Allowed IRS Secured and Priority Claims pursuant to the terms of the Plan.

The foregoing recovery and distribution estimates rely upon certain assumptions concerning the aggregate amount of Claims that will ultimately be Allowed Claims in the Chapter 11 Case and the amounts received in respect of the Aeropostal Receivable and otherwise prior to the Effective Date.

**B.    Filing of Falcon Air's Chapter 11 Case**

On May 10, 2006 (the "Petition Date"), Falcon Air filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Official Committee of Unsecured Creditors (the "Committee") was initially appointed in the Chapter 11 Case on May 22, 2006, and has been reconstituted several times since that date. By order dated June 26, 2006, Kenneth A. Welt was appointed Chapter 11 Trustee for Falcon Air pursuant to 11 U.S.C. § 1104,

vested with the powers and duties set forth in 11 U.S.C. § 1106 and the authority to operate the business of the Debtor pursuant to 11 U.S.C. § 1108.

### C.    Purpose of Disclosure Statement

This Disclosure Statement is submitted in accordance with Bankruptcy Code section 1125 for the purpose of soliciting acceptances of the Plan from Holders of certain of Claims and Equity Interests. Acceptances of the Plan are being sought only from Creditors whose Claims are "impaired" (as that term is defined in Bankruptcy Code section 1124) by the Plan and who are receiving or retaining property under the Plan. Holders of Claims that are not impaired are deemed to have accepted the Plan. Holders of Claims or Equity Interests that are not receiving or retaining any property under the Plan are deemed to have rejected the Plan.

Subject to the disclaimers set forth below, the Proponents have prepared this Disclosure Statement pursuant to Bankruptcy Code section 1125, which requires that a copy of the Plan, or a summary thereof, be submitted to all Holders of Claims against, and Equity Interests in, the Debtor, along with a written disclosure statement containing adequate information about the Debtor of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Holders of Claims and Equity Interests to make an informed judgment in exercising their right to vote on the Plan.

### D.    Disclaimers

**THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO BUT NOT YET APPROVED BY THE BANKRUPTCY COURT. A CONSOLIDATED HEARING FOR THE COURT TO CONSIDER BOTH APPROVAL OF THIS DISCLOSURE STATEMENT AND CONFIRMATION OF THE ACCOMPANYING PLAN IS SCHEDULED FOR MARCH 5, 2007, AT 10:30 A.M. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED SOLELY FOR THE USE OF CREDITORS IN EVALUATING THE PLAN AND VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON, OR WHETHER TO OBJECT TO, THE PLAN. THE REORGANIZATION OF THE DEBTOR PURSUANT TO THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ABSOLUTE ASSURANCE THAT THE PLAN, AS CONTEMPLATED, WILL BE EFFECTUATED.**

**NEITHER THE FILING OF THE PLAN NOR ANY STATEMENT OR PROVISION CONTAINED IN THE PLAN OR IN THE DISCLOSURE STATEMENT, NOR THE TAKING BY ANY PARTY IN INTEREST OF ANY ACTION WITH RESPECT TO THE PLAN, SHALL (I) BE OR BE DEEMED TO BE AN ADMISSION AGAINST INTEREST AND (II) UNTIL THE EFFECTIVE DATE, BE OR BE DEEMED TO BE A WAIVER OF ANY RIGHTS ANY PARTY IN INTEREST MAY HAVE**

(A) AGAINST ANY OTHER PARTY IN INTEREST OR (B) IN ANY OF THE ASSETS OF ANY OTHER PARTY IN INTEREST, AND, UNTIL THE EFFECTIVE DATE, ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED OR FAILS TO BECOME EFFECTIVE, NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT, NOR ANY STATEMENT CONTAINED IN THE PLAN OR IN THE DISCLOSURE STATEMENT, MAY BE USED OR RELIED ON IN ANY MANNER IN ANY SUIT, ACTION, PROCEEDING OR CONTROVERSY, WITHIN OR WITHOUT THE DEBTOR'S CHAPTER 11 CASE, INVOLVING THE DEBTOR, EXCEPT WITH RESPECT TO CONFIRMATION OF THE PLAN.

THE DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE TRUSTEE'S PROPOSED PLAN. PLEASE READ THIS DOCUMENT THOROUGHLY AND CAREFULLY. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE YOU WITH "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE DEBTOR'S NATURE AND HISTORY AND THE CONDITION OF ITS BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE PROPONENTS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("SEC") NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THIS DISCLOSURE STATEMENT OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR

INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN, YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE UNITED STATES TRUSTEE FOR APPROPRIATE ACTION AND TO THE TRUSTEE'S COUNSEL, WHO SHALL DELIVER THAT INFORMATION TO THE BANKRUPTCY COURT FOR APPROPRIATE ACTION.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION.

**E.    Consolidated Hearing on Approval of the Disclosure Statement and Confirmation of the Plan**

The Bankruptcy Court has set March 5, 2007, at 10:30 a.m. prevailing Eastern Standard Time as the time and date for the consolidated hearing to determine whether (i) this Disclosure Statement contains "adequate information" as defined in Bankruptcy Code section 1125(a)(1), and (ii) the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. If the Plan is rejected by one or more Impaired Classes of Claims, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Bankruptcy Code section 1129(b) (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims impaired under the Plan. The procedures and requirements for voting on the Plan are described in more detail below.

**F.    Sources of Information**

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its business, properties and management have been prepared from information furnished by the Debtor.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Proponents have made every effort to retain the meaning of such other documents or portions that have been summarized, they urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of any document summarized or described herein, the actual terms of the document shall govern and apply.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection herewith shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the Holder of a Claim or Equity Interest under the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be immediately reported to counsel for the Trustee.

## ARTICLE II
## EXPLANATION OF CHAPTER 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other interested parties.

The commencement of a chapter 11 case creates an estate comprising all of the debtor's legal and equitable interests in property as of the date the petition is filed. Unless the Bankruptcy Court orders the appointment of a trustee (as in this Chapter 11 Case), Bankruptcy Code sections 1101, 1107 and 1108 provide that a chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession."

The filing of a chapter 11 petition also triggers the automatic stay under Bankruptcy Code section 362. The automatic stay essentially halts all attempts to collect pre-petition claims from the debtor or to otherwise interfere with the debtor's business or its bankruptcy estate.

Formulating a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims of creditors against, and interests of equity security holders in, the debtor. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case. This 120-day period is called the "Exclusive Period." After the Exclusive Period has expired, a creditor or any other interested party may file a plan, unless the debtor files a plan within the Exclusive Period. The Exclusive Period in the Chapter 11 Case terminated upon the appointment of the Trustee in June, 2006.

### B.    Plan of Reorganization

After a plan has been filed, the holders of claims against, or equity interests in, a debtor are permitted to vote to accept or reject the plan. Chapter 11 does not require that each holder of a claim against, or equity interest in, a debtor vote in favor of a plan in order for the plan to be confirmed. At a minimum, however, a plan must be accepted by a majority in number and two-thirds in dollar amount of those claims actually voting from at least one class of claims impaired

7

under the plan.  The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan, and therefore are not entitled to vote.  A class is "impaired" if the plan modifies the legal, equitable, or contractual rights attaching to the claims or equity interests of that class.  Modification for purposes of impairment does not include curing defaults and reinstating maturity or payment in full in cash.  Conversely, classes of claims or equity interests that receive or retain no property under a plan of reorganization are conclusively presumed to have rejected the plan, and therefore are not entitled to vote.

Even if all classes of claims and equity interests accept a plan of reorganization, the Bankruptcy Court may nonetheless deny confirmation.  Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code.  A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization or liquidation.

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept the plan.  The Court may do so under the "cramdown" provisions of Bankruptcy Code section 1129(b).  In order for a plan to be confirmed under the cramdown provisions, despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not discriminate unfairly and that it is fair and equitable with respect to each impaired class of claims or equity interests that has not accepted the plan.

The Bankruptcy Court must further find that the economic terms of the particular plan meet the specific requirements of Bankruptcy Code section 1129(b) with respect to the subject objecting class.  If the proponent of the plan proposes to seek confirmation of the plan under the provisions of Bankruptcy Code section 1129(b), the proponent must also meet all applicable requirements of Bankruptcy Code section 1129(a) (except section 1129(a)(8)).  Those requirements include the requirements that (i) the plan comply with applicable Bankruptcy Code provisions and other applicable law, (ii) that the plan be proposed in good faith, and (iii) that at least one impaired class of creditors or interestholders has voted to accept the plan.

## ARTICLE III
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to Creditors (or their authorized representative) entitled to vote.  After

carefully reviewing the Disclosure Statement, including all exhibits, each Creditor (or its authorized representative) entitled to vote should indicate its vote on the enclosed Ballot.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than March 1, 2007, at 4:00 p.m. prevailing Eastern Standard Time (the "Voting Deadline") by the Clerk of the Bankruptcy Court. Instructions for filling out and submitting your ballot will be contained on the Ballot. Please review and follow those instructions carefully.

All Creditors (or their authorized representative) entitled to vote must:

- carefully review the Ballot and corresponding instructions,

- execute the Ballot, and

- return it to the address indicated on the ballot by the Voting Deadline for the Ballot to be considered

**BALLOTS MUST BE RECEIVED NO LATER THAN MARCH 1, 2007, AT 4:00 P.M. PREVAILING EASTERN STANDARD TIME. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BALLOT BY SENDING A WRITTEN REQUEST TO THE TRUSTEE'S COUNSEL AT THE ADDRESS LISTED ON THE BALLOT.**

A.      **Creditors Entitled to Vote**

Unless otherwise specified, any Holder whose Claim or Equity Interest is Impaired under the Plan is entitled to vote if either (i) the Debtor has scheduled the Claim in its Schedules and such Claim is not scheduled as actually or may be disputed, contingent, or unliquidated; or (ii) the Holder has filed a proof of claim or interest on or before the General Claims Bar Date or such other applicable Bar Date. **Returning the ballot does not constitute filing a proof of claim or equity interest.**

Any Holder of a Claim to which an Objection has been filed (and such Objection is still pending on the Voting Deadline) is not entitled to vote, unless the Bankruptcy Court, upon motion filed by such party whose Claim is subject to an Objection, temporarily allows the Claim in a specific amount for the purpose of voting to accept or reject the Plan. Such motion must be heard and determined by the Bankruptcy Court at or before the Confirmation Hearing. A vote may be disregarded if the Bankruptcy Court determines that the Holder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

Under Bankruptcy Code section 1126(f), a class that is not impaired under a chapter 11 plan, and each Holder of a Claim or Equity Interest in such class, are conclusively presumed to have accepted the chapter 11 plan. Under Bankruptcy Code section 1126(g), a class is deemed not to have accepted a chapter 11 plan if the Holders of Claims or Equity Interests in such class do not receive or retain any property under the chapter 11 plan on account of such Claims or

Equity Interests. Holders of Claims or Equity Interests that are unimpaired under the Plan, or that are not entitled to receive or retain any property under the Plan, are not entitled to vote to accept or reject the Plan.

**B.      Bar Date for Filing Proofs of Claim**

The Bankruptcy Court established September 18, 2006 as the general deadline for filing proofs of claim and proof of interests in the Chapter 11 Case in respect of Claims and Equity Interests that arose before the Petition Date (called the "General Claims Bar Date") with four exceptions: (i) in the event that the Debtor amends its Schedules, the Debtor must give notice of such amendment to the Claimholder affected thereby, and the affected Claimholder shall have the later of the General Claims Bar Date or thirty (30) days from the date on which notice of such amendment was given to file a proof of claim; (ii) in the event that the Debtor amends its list of Equity Security Holders filed with the Court pursuant to Bankruptcy Rule 1007(a)(3), the Debtor must give notice of such amendment to the Interestholders affected thereby, and such Interestholders shall have the later of the General Claims Bar Date or thirty (30) days from the date on which notice of such amendment was given to file a proof of interest; (iii) in the event that a Claim arises with respect to the Debtor's rejection of an Executory Contract or unexpired lease, the non-Debtor party to such contract or lease shall have the later of the General Claims Bar Date or thirty (30) days after the effective date of any order authorizing the rejection of the Executory Contract or unexpired lease to file a proof of claim; and (iv) the deadline for filing a proof of claim by any governmental unit (as defined by section 101(27) of the Bankruptcy Code) holding or wishing to assert a Claim against the Debtor was November 6, 2006 (the "Government Claims Bar Date").

**C.      Definition of Impairment**

Under Bankruptcy Code section 1124, a class of Claims or Equity Interests is impaired under a plan of reorganization unless, with respect to each Claim or Equity Interests of such class, the Plan:

(1)      leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity interest; or

(2)      notwithstanding any contractual provision or applicable law that entitles the holder of a claim or equity interest to receive accelerated payment of such claim or equity interest after the occurrence of a default:

(a)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Bankruptcy Code section 365(b)(2);

(b)      reinstates the maturity of such claim or equity interest as it existed before the default;

(c)      compensates the holder of such claim or equity interest for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

10

(d)    if such claim or such interest arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## D.    Classes Entitled to Vote on the Plan

Claims or Equity Interests in the following Classes are impaired under the Plan. Therefore, holders of those Claims and Equity Interests are eligible, subject to the voting limitations described below, to vote to accept or reject the Plan.

1.    **Class 2: IRS Secured and Priority Claims (Impaired).**
2.    **Class 3: DOJ Trust Fund Claims (Impaired).**
3.    **Class 8: JetGlobal Secured DIP Financing Claim (Impaired).**
4.    **Class 10: General Unsecured Claims (Impaired).**

The Bankruptcy Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject the plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted the plan and are not entitled to vote on it. The Holders of Priority Non-Tax Claims in Class 1, the DFAS Secured Claim in Class 4, the USDA Secured Claim in Class 5, Security Deposit Claims in Class 6, Secured Financing Claims in Class 7 and Other Secured Claims in Class 9 are not Impaired under the Plan. Thus, pursuant to section 1126(f) of the Bankruptcy Code, the claimants in Classes 1, 4, 5, 6, 7 and 9 are deemed to have accepted the Plan, and are not entitled to vote. On the other hand, Holders of Equity Interests in Class 11 are not entitled to receive or retain any property under the plan and, therefore, are conclusively presumed to have rejected the plan and are not entitled to vote.

The holders of Claims in Classes 2, 3, 8 and 10 are Impaired and are entitled to receive or retain property under the plan and thus may vote to either accept or reject the Plan. The Trustee has enclosed Ballots with this Disclosure Statement to solicit the votes of all claimants in Classes 2, 3, 8 and 10.

## E.    Vote Required for Class Acceptance

The Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that class that actually cast ballots for acceptance or rejection of the Plan; that is, acceptance takes place only if creditors holding Claims constituting at least two-thirds in dollar amount of the total amount of Claims and more than one-half in number of the creditors actually voting cast their ballots in favor of acceptance.

11

F.    **Confirmation of Plan**

**Solicitation of Acceptances. The Proponents are soliciting your vote in favor of the Plan.**

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE PROPONENTS, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO TRUSTEE'S COUNSEL FOR APPROPRIATE ACTION.**

**THIS IS A SOLICITATION SOLELY BY THE PROPONENTS, AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY, ACCOUNTANT, OR OTHER PROFESSIONAL FOR THE PROPONENTS OR THE DEBTOR. THE REPRESENTATIONS, IF ANY, MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE PROPONENTS AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan generally may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. In this case, the Bankruptcy Court has entered an Order pursuant to Bankruptcy Code section 105(d)(2)(B)(vi) combining the hearing on approval of this Disclosure Statement together with the Confirmation Hearing, both to be held on March 5, 2007, at 10:30 a.m. This Disclosure Statement, therefore, has not yet been approved by the Court.

G.    **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of Bankruptcy Code section 1129 have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the Plan. For the Plan to be confirmed, Bankruptcy Code section 1129 requires that:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor has complied with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment or distribution made or promised by the Debtor or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in connection with the Plan has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or

if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and interest holders and with public policy; and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor and the nature of any compensation for such insider;

(f)    Any government regulatory commission with jurisdiction (after confirmation of the Plan) over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

(g)    With respect to each impaired Class of Claims or Equity Interests, either each holder of a Claim or Equity Interest of the Class has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code. If Bankruptcy Code section 1111(b)(2) applies to the Claims of a Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the Debtor's interest in the property that secures that claim;

(h)    Each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

(i)    Except to the extent that the holder of a particular Allowed Administrative Claim, Allowed Priority Tax Claim, or Allowed Priority Non-Tax Claim has agreed to a different treatment of its Claim, the Plan provides that such Claims shall be paid in full on the later of the Effective Date or ten (10) days after the Allowance Date;

(j)    If a Class of Claims or Equity Interests is impaired under the Plan, at least one such Class of Claims or Equity Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest of that Class; and

(k)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Proponents believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan was proposed in good faith. The Proponents believe that they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

## H.    Acceptances Necessary to Confirm the Plan

Voting on the Plan by each Creditor (or its authorized representative) is important. Chapter 11 of the Bankruptcy Code does not require that each Creditor vote in favor of the Plan in order for the Court to confirm the Plan.  Generally, to be confirmed under the acceptance provisions of Bankruptcy Code section 1126(a), the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan.  Even if all Classes of Claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

## I.    Cramdown

In the event that any impaired Class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Proponents if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.   "Fair and equitable" has different meanings for holders of secured and unsecured claims and equity interests.

With respect to a secured claim, "fair and equitable" means either (i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claims with a present value as of the effective date of the plan at least equal to the value of such creditor's interest in the property securing its liens; (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the plan.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan.

With respect to equity interests, "fair and equitable" means either (i) each impaired equity interest receives or retains, on account of that equity interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the equity interest, or (ii) the holder of any equity interest that is junior to the equity interest of that class will not receive or retain under the plan, on account of that junior equity interest, any property.

The Proponents believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Equity Interests.  In the event at least one Class of impaired Claims or Equity Interests rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair

and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims or Equity Interests.

## ARTICLE IV
## BACKGROUND OF THE DEBTOR

### A.    Description of Falcon Air's Business

#### 1.    Background

Falcon Air was originally formed in 1986, but it began its operations as a charter carrier in 1996. Falcon obtained its operating certificate on March 5, 1996, and its FAA certification on March 13, 1996. Falcon was historically a passenger charter airline providing service in the Western Hemisphere, particularly North, South and Central America. Falcon's operations consisted primarily of charter services, predominately provided on "ACMI" terms (Aircraft, Crew, Maintenance and Insurance). The ACMI service involved Falcon Air providing aircraft complete with crew, maintenance and insurance coverage to other carriers and charter customers for a fee. Falcon Air's charter services included flight operations for tourists, high-end charters and Department of Defense ("DOD") charters. Falcon Air has been specifically certified to provide the DOD charter service. For the year ended December 31, 2005, Falcon Air generated operating revenues of approximately $32.8 million. In 2005, the ACMI operations represented 40% of Falcon Air's business and other charter flights represented 60% of Falcon Air's business. During the first quarter of 2006, Falcon Air generated operating revenues of approximately $6 million. Falcon Air currently has 79 employees.

#### 2.    Government Regulation

The DOT and the FAA have regulatory authority over air carriers, including Falcon Air. The FAA's regulatory authority relates primarily to air safety, including aircraft certification and operations, crew and maintenance personnel licensing/training, and maintenance standards. FAA approval is required for certain long-term ACMI services, and DOT approval is required for certain long-term ACMI services with foreign air carriers. In addition, FAA approval may be required for certain short-term, seasonal ACMI services.

### B.    Corporate Information

#### 1.    The Debtor

- Falcon Air Express, Inc., a Florida corporation.

#### 2.    Existing Equity Structure

- 51% of common stock owned by Emilio Dirube.
- 49% of common stock owned by Mercedes Dirube

### 3.    Current Management and Directors of Falcon Air

Falcon Air's former President and Chief Executive Officer, Emilio Dirube, was removed shortly after the appointment of the Trustee on or about June 26, 2006. Additionally, the following former officers were terminated in July, 2006, after appointment of the Trustee: (i) James Sprinkle, Chief Operating Officer; (ii) Lillian Dirube, Vice President of Administration; (iii) EJ Dirube, Vice President of Sales and Marketing; (iv) Robert Coile, Chief Financial Officer and Vice President of Finance; and (v) Randall Lloyd, Director of Finance. Since that date, the business and financial affairs of Falcon Air have been operated by the Trustee and his staff pursuant to sections 1106 and 1108 of the Bankruptcy Code. The following directors of Falcon Air, known as the "five wisemen," have remained with Falcon Air and are expected to stay on with the Reorganized Debtor on and after the Effective Date:

- Armando Martinez – Director of Operations
- Rafael Chirino – Director of Safety
- Tom Van Halm – Chief Pilot
- William Swope – Director of Maintenance
- Ariel Rodriguez – Director of Quality Assurance

As detailed in their *curricula vitae* attached hereto as composite Exhibit 2, Falcon Air's directors are highly capable professionals with substantial experience and knowledge of the airline industry.

### C.    Events Leading to Chapter 11 Filing

Pre-petition, Falcon Air's fleet of 12 aircraft consisted primarily of Boeing 727s. These aircraft use three engines to fly. With ever-rising fuel costs, this 727 fleet proved virtually impossible to operate profitably. As a result, Falcon Air was unable to remain competitive in its rates and, as a result, both the ACMI and charter business segments suffered. Through 2005, however, Falcon Air continued operations and pursued efforts to reorganize and re-fleet its operations without resorting to a chapter 11 filing. However, fuel costs continued to rise and Falcon Air was unable to re-fleet its operations without bankruptcy protection. Rising fuel costs created significant financial strain for Falcon Air, which in turn resulted in Falcon Air falling behind with respect to certain federal tax obligations. Falcon Air filed its bankruptcy case in an effort to restructure its business operations and re-fleet in the wake of the continuing fuel crisis and mounting tax obligations.

### D.    Financial Information

For the year ended December 31, 2005, Falcon Air generated operating revenues of approximately $32.8 million. As set forth above, in 2005, the ACMI operations represented 40% of Falcon Air's business and other charter flights represented 60% of Falcon Air's business. During the first quarter of 2006, Falcon Air generated operating revenues of approximately $6 million. Pre-petition, Falcon Air employed approximately 175 people. However, just prior to the filing, Falcon Air laid off approximately 75 employees. Falcon Air further reduced its staff after appointment of the Trustee and currently has 79 employees.

E.    **Claims Against the Estate**

1.    **General Unsecured Claims**

The asserted amount of General Unsecured Claims is approximately $50 million, but the Trustee believes that this amount will be reduced significantly after objections to these Claims are fully prosecuted. The largest General Unsecured Claims, based upon the proofs of claim timely filed in the Chapter 11 Case or listed in the Schedules, as applicable, are set forth below:[4]

| CREDITOR | CLAIM AMOUNT |
|----------|-------------|
| Aviation Refinancing Transaction LLC | $25,537,035.00 |
| RPK Capital | $7,531,068.09 |
| Pegasus Aviation, Inc. | $6,552,774.00 |
| MSA V c/o AWAS Aviation Services, Inc. | $5,024,935.40 |
| WorldTravel Charter Services, LLC | $2,434,750.00 |
| Miami-Dade Aviation Finance Division | $1,244,128.40 |
| U.S. Customs & Border Protection ("Customs") | $1,158,078.96 |
| U.S. Department of Transportation | $718,915.72 |
| Hamilton Aerospace Technologies, Inc. | $632,558.48 |
| Transportation Security Administration ("TSA") | $571,454.39 |
| Jet Solutions International, Inc. | $279,479.27 |
| Phoenix Fuel, LLC | $256,169.96 |
| U.S. Department of Agriculture ("USDA") | $234,425.08 |
| Aviation Brake Service | $200,220.00 |
| Worldwide Flight Service, Inc. | $121,415.63 |
| Aeroservice Aviation | $102,373.06 |

2.    **Secured and Trust Fund Claims**

a.  **IRS Claim**

---

[4]       Nothing contained in this Disclosure Statement shall be deemed an admission as to any purported liability identified herein and the Trustee reserves the right to dispute any and all of the claims, as to amount and priority, set forth in this summary, the Schedules and/or this Disclosure Statement.

Pre-petition, the Debtor incurred various tax obligations, including significant sums for federal payroll and withholding taxes. The IRS filed a proof of claim in the Chapter 11 Case, designated claim no. 37, asserting a total pre-petition claim in the amount of $8,912,780.11, of which the amount of $7,722,086.53 is asserted as a secured claim, $1,143,212.97 is asserted as an unsecured priority claim, and $47,480.61 is asserted as a general unsecured claim. The Trustee filed an objection to this claim on a number of bases (C.P. No. 371). The IRS filed a response to the objection on November 8, 2006. The Trustee is attempting to reach a compromise with the IRS that will enable payment of lesser-priority classes of claims in the Chapter 11 Case including Administrative Claims. The Trustee disputes the extent to which the IRS Claim is secured and would encumber the proceeds of the stock sale to SkyValue under the Plan. At this point, the Trustee does not know and cannot predict with any certainty the ultimate outcome of his negotiations with the IRS with respect to the IRS Claim.

### b. DOJ Trust Fund Claims

The DOJ represents certain federal agencies that have asserted claims in the Chapter 11 Case – namely, U.S. Customs and Border Protection, Transportation Security Administration, U.S. Department of Agriculture, and Defense Finance and Accounting Service. The Claims filed by these entities total approximately $2.2 million. To the extent that the Claims filed by these entities represent unpaid statutory "user fees" payable to the various federal agencies for flights operated by Falcon Air, assessed on a per-passenger or other basis, the funds payable by the Estate in respect of such charges may constitute trust funds that are not property of the estate. *See, e.g.,* 19 U.S.C. § 58c(d), 8 U.S.C. § 1356. A creditor asserting that its claim is payable out of a non-estate trust fund, however, has an obligation to trace and identify the funds that constitute its trust funds; though relatively simple when such funds have been collected by the debtor and segregated into a separate account, it is virtually impossible to trace such funds when they have been deposited into a general operating account and commingled with other funds, as in the case of Falcon Air.

Courts faced with this situation have allowed alleged trust fund creditors to satisfy their tracing obligation under a standard known as the "lowest intermediate balance" test, which, in the user fee context, entitles the claimant to show the day-to-day balance of the operating or other account(s) in which the fees were collected. If the lowest balance of such account(s) on any interim day from the date of collection of the fees (with an end date of the petition date in the bankruptcy context) is greater than the total amount of the trust fund claim, then the claimant is entitled to payment of its entire claim. If any intermediate daily balance of the account(s) is less than the amount of the claim, then the claimant is only entitled to dollar-for-dollar trust fund payment of the lowest intermediate balance on any given day, including the petition date. Without recourse to an available trust *res*, the user fee claims would simply be general unsecured claims. *See, e.g., United States v. McConnell,* 258 B.R. 869, 875-76 (N.D. Tex. 2001).

According to its Schedules, as of the Petition Date, Falcon Air held just $1,361 in the operating accounts where any user fees would have been deposited -- $701 in its TotalBank account and $660 in its Bank of America account. *See* Debtor's Schedule B-2, p. 1. Under the "lowest intermediate balance" test, therefore, the Trustee believes that the amount of the DOJ's trust fund claim (payable in full) would be limited to $1,361, and the balance of the DOJ Trust

Fund Claims in respect of statutory user fees would be General Unsecured Claims. Additionally, upon information and belief a surety bond in the amount of $100,000 is available for payment of certain fees, charges and penalties payable to U.S. Customs and Border Protection. The Trustee has filed an objection to the DOJ Trust Fund Claims for the reasons stated above.

The DOJ disagrees with the Trustee's position and asserts that the alleged trust funds are not subject to common law tracing principles, such as the lowest intermediate balance test. *See Begier v. Internal Revenue Service*, 496 U.S. 53 (1990). If the Court, however, holds that the lowest intermediate balance test must be used, then the DOJ asserts that all of the Debtor's accounts where the trust funds were deposited and/or transferred must be considered and not just the two operating accounts identified above. *See McConnell*, 258 B.R. at 875-76.

The IRS and DOJ have agreed that any agreement reached with the Trustee will be in settlement and satisfaction of both the IRS Claim and DOJ Trust Fund Claims, and any Distribution payable to the DOJ in respect of the DOJ Trust Fund Claims will be paid solely by the IRS and not by the Estate. In the absence of such an agreement, however, the Trustee reserves his rights to object to the DOJ Trust Fund Claims for the reasons set forth above.

### c.    Other Secured Claims

Other than the IRS, the Trustee does not believe that the Estate has significant allowable secured debt. Though Secured Claims other than the IRS Claim have been filed in a total amount exceeding $100,000, the Trustee believes that the only Allowed Secured Claim that may receive a Cash Distribution on the Effective Date is the USDA Secured Claim in the amount of $10,672.57, since, as discussed more fully in the Article VII herein, those Claims will be satisfied by such Holders (i) either receiving and retaining the collateral securing such Claims, (ii) being allowed to exercise their setoff rights to the extent that any such Claim is secured by a valid right of setoff, or (iii) retaining their liens while the Reorganized Debtor continues to perform the Debtor's obligations under the applicable security agreements or Court orders, as the case may be. Any deficiency claim in respect of an Allowed Secured Claim will be treated as an Allowed Class 10 General Unsecured Claim under the Plan. On November 21, 2006, the Trustee filed an omnibus objection to, among others, improperly asserted secured claims. The objection was sustained by the Court (*see* C.P. Nos. 479 and 515) as to each disputed secured claim.

### 3.    Administrative Claims

### a.    Ordinary Course Liabilities and Administrative Trade Claims

The Trustee has incurred post-petition liabilities in the operation of the Debtor's business, some of which it has paid in the ordinary course under the terms of the particular agreements giving rise to such trade claims and some of which he will pay on the Effective Date under the Plan. Though the Trustee cannot estimate the total allowable amount of Administrative Claims, Administrative Claims totaling approximately $920,000 have been filed (i) by MSA V c/o AWAS Aviation Services, Inc. ("AWAS"), for post-petition, pre-rejection amounts totaling $195,526.89 allegedly due under a certain aircraft lease rejected as of August 1, 2006; (ii) by Phoenix Fuel, LLC ("Phoenix Fuel"), pursuant to section 503(b)(9) of the

Bankruptcy Code, for fuel valued at $204,159.03 allegedly supplied to Falcon Air within the 20 days before the Petition Date; (iii) by RPK Capital I, L.L.C. ("RPK") for damages in the amount of $50,000 allegedly caused by the Debtor's failure to turn over certain records and maintenance logs to RPK in connection with the Debtor's rejection of an aircraft lease; and (iv) by JetGlobal, LLC ("JetGlobal") for a debtor-in-possession loan (total outstanding amount should not exceed approximately $410,000.00 including interest and costs through March 15, 2007) discussed more fully below, and post-petition fuel supplied to the Debtor by Petro Energy and guaranteed by Jet Global ($63,564.00). The Trustee has objected to the claims filed by AWAS and Phoenix Fuel pursuant to section 502(d) of the Bankruptcy Code on the basis that these claimants received certain pre-petition transfers that may be avoidable and recoverable by the Estate pursuant to sections 547 and 550 of the Bankruptcy Code. The Trustee believes that the Estate has fully satisfied its surrender and return obligations and has no liability to RPK under the aircraft lease rejection order since Falcon Air turned over to RPK all maintenance logs and records in its possession; accordingly, the Trustee intends to contest RPK's claim in its entirety. The Trustee intends to pay all undisputed amounts owed directly to Petro Energy for post-petition fuel supplied, and therefore will contest the amount asserted by JetGlobal as guarantor for payment of such fuel; the Committee and/or Liquidating Trustee intend to contest JetGlobal's Claim arising from its DIP loan for the reasons described in Article IV.E.3.b. below.

Additionally, the Trustee estimates that another $475,000 of accrued post-petition trade payables may remain outstanding as of the Effective Date. This estimate assumes that Falcon Air does not operate charters for Aeropostal after February 17, 2007 while continuing to accrue operating expenses through the Effective Date that are not offset by operating income; the Trustee reasonably anticipates, however, that this amount will be reduced by income received from other charters or sources of income.

Accordingly, the outstanding amount of Administrative Claims (not including Professional Claims) payable in full under the Plan could total up to $1.4 million.[5]

### b. JetGlobal Post-Petition Financing

Among its "first-day" motions, the Debtor sought approval of a post-petition secured credit facility with JetGlobal as lender in the total amount of $1 million pursuant to section 364 of the Bankruptcy Code. By Order entered May 19, 2006 (C.P. No. 41), the Court granted this motion on a preliminary basis, authorizing the Debtor to borrow up to $350,000 from JetGlobal under the credit facility and purporting to grant JetGlobal a first-priority security interest in the Debtor's assets pending a final hearing on the motion. The Debtor borrowed such amount from JetGlobal allegedly to fund its working capital needs on a short-term basis. The Trustee was appointed prior to a final hearing on the DIP financing motion, and a final hearing was never held. The $350,000 principal amount of the loan plus interest and costs have been asserted by JetGlobal as an Administrative Claim. JetGlobal also asserts that it holds a Secured

---

[5]     The IRS also filed an Administrative Claim in the amount of $1,118,592.90 for estimated, unassessed payroll and excise tax liabilities for the third and fourth quarters of 2006; the Trustee has filed returns for the payroll taxes showing the Estate is owed a refund, and will soon file returns for the excise taxes showing no amount due since these taxes have been timely paid post-petition. The Trustee, therefore, believes that no amount will be due the IRS on this claim.

Claim in respect of this loan, which Claim, albeit disputed by the Trustee and Committee for the reasons set forth herein, is classified in Impaired Class 8 under the Plan. The Trustee and Committee believe that JetGlobal's claim in respect of the DIP financing may be subject to equitable subordination under section 510(c) of the Bankruptcy Code based upon certain alleged misconduct by JetGlobal in connection with the transactions that give rise to such Claim. The Trustee, Committee and Liquidating Trustee reserve their rights to prosecute any available claims or defenses against JetGlobal, and its affiliates and related persons or entities, for damages or other relief, including without limitation equitable subordination, fraud and bad faith, in respect of their transactions relating to the Debtor.

### c.  Cure Claims

All required Cure amounts in respect of the Assumed Contracts will be payable by the Reorganized Debtor in accordance with the Stock Issuance and Plan Funding Agreement and Section 4.4 of the Plan, and will not be obligations of the Estate.

### d.  Professional Claims

Subject to the final fee applications that will be filed by Professionals prior to the Confirmation Hearing, and the final hearings thereon, the Trustee estimates that the total amount of professional fees and costs incurred through and payable at Confirmation including the Trustee's statutory commission under 11 U.S.C. § 326(a) will total approximately $1.66 million, as detailed in Article VI.D. below.

**Accordingly, the Trustee anticipates that the ultimate amount of Allowed Administrative Claims (including Professional Claims) payable in full under the Plan may be close to $3.1 million.**[6]

### 4.  Priority Claims

### a.  Priority Tax Claims

Besides the IRS's unsecured priority claim filed in the amount of $1,143,212.97, which the Trustee anticipates will be resolved as part of any settlement with the IRS, the only other Priority Tax Claims were filed by the Miami-Dade County Tax Collector and Indiana Department of Revenue in the total amount of approximately $6,000.[7]

---

[6]     This amount, however, includes a reserve for the JetGlobal DIP financing claim which the Trustee, Committee and/or Liquidating Trustee reserve the right to challenge as discussed herein.

[7]     The Priority Tax Claims identified above include amounts asserted as Secured Claims; for purposes of administrative convenience, however, these Claims will be treated as Priority Tax Claims and paid in full on the Effective Date under the Plan.

### b.  Priority Non-Tax Claims

Many of the Debtor's former employees and others have filed claims for, among other things, unpaid wages and accrued vacation or sick pay. The total filed amount of unsecured priority wage claims was approximately $220,000. To the extent that any particular employee holds a valid claim for unpaid wages, accrued vacation or sick pay arising within the 180 days preceding the Petition Date, such claim may be entitled to priority up to the amount of $10,000 under section 507(a)(4) of the Bankruptcy Code, and, as such, would be payable in full under the Plan. Certain of these claimants were independent contractors rather than Falcon Air employees and therefore are not entitled to priority wage claims under section 507(a)(4). Also, many of these employees asserted claims for unused sick days, which the Debtor had never paid pursuant to its employee handbook or historical practices. A number of employees also asserted invalid or overstated claims for unused vacation days and unpaid wages. On November 21, 2006, the Trustee filed an omnibus objection to a number of the employee claims and priority claims filed by certain pre-petition trade creditors with no valid basis for priority treatment. The objection was sustained by the Court (see C.P. No. 479) with respect to all disputed priority claims, and the estimated allowable amount of Class 1 Priority Non-Tax Claims could total up to $110,000.

### c.  Airport User Fees

In addition to the DOJ Trust Fund Claims, a number of airports were listed on Schedule E-T of the Debtor's Schedules as holding unsecured priority claims in various amounts. Upon information and belief, the airports' claims represent user and landing fees. All the claims listed on Schedule E-T, however, are scheduled as subject to a dispute as to amount and priority status. Unless such scheduled entities file proofs of claim, therefore, they will not have Allowed Claims pursuant to Bankruptcy Rule 3003(c)(2). In any event, the Trustee believes that any user fees or landing fees are not entitled to priority treatment as "taxes" or otherwise under section 507(a) of the Bankruptcy Code and are not entitled to payment as trust fund claims for the same reasons that apply to the DOJ Trust Fund Claims, discussed above.

**In conclusion, the Trustee anticipates that the ultimate amount of Allowed Priority Claims (not including the IRS Claim) payable in full under the Plan should not exceed approximately $116,000.**

### F.     Debtor's Assets

For a complete description of the Debtor's assets and liabilities as of the Petition Date, interested parties are directed to the Debtor's Schedules filed June 14, 2006 (C.P. No. 103), which may be obtained from the Court's electronic docket in the Chapter 11 Case or by contacting the Trustee's counsel. The Schedules were prepared by the Debtor's former management and an outside consultant, and may not be accurate. A summary description of the Debtors primary assets follows:

### 1.    Aircraft Operating Certificates

Falcon Air's most significant assets are its FAA Part 121 operating certificate and DOT certificate of public necessity and convenience, which enable Falcon Air to operate foreign and domestic charter flights. Indeed, these certificate authorities are the primary consideration for SkyValue under the Stock Issuance and Plan Funding Agreement.

### 2.    Aircraft Leases

Falcon Air currently operates two McDonnell Douglas airplanes (MD-82/serial no. 44905 and MD-83/serial no. 53045) and two Pratt & Whitney JTD8-219 engines per plane (collectively, the "Leased Aircraft") that it subleases from Aeropostal pursuant to certain aircraft sublease agreements dated June 1, 2005, and May 3, 2006, respectively (the "Falcon Air Subleases"). Aeropostal, in turn, subleases the MD-82 from Aerco Limited ("Aerco") and subleases the MD-83 from Spirit Airlines, Inc. ("Spirit").

Falcon Air operates the Leased Aircraft pursuant to an Aircraft Wet Lease Agreement with Aeropostal dated as of February 17, 2006 (the "Wet Lease"), and an Aircraft Management Agreement with Aeropostal dated as of February 10, 2006 (the "Management Agreement").

Under the Wet Lease and Management Agreement, Falcon Air charters the Leased Aircraft and provides a FAA-certified and qualified crew, maintenance and insurance, for which Aeropostal pays Falcon Air the amount of $75,000 per week. The Trustee expects to continue operating for Aeropostal through February 17, 2007, and possibly longer if the parties reach an agreement to continue operating through Confirmation.

### 3.    Miami Airport Use Agreement

Falcon Air and Miami-Dade County Aviation Department ("MDAD") are parties to an Airline Use Agreement (the "Use Agreement") for Miami International Airport ("MIA"), dated as of May, 23, 2005, providing Falcon Air the right to use MIA and its facilities subject to payment of certain fees and charges relating to such use, including landing fees, parking fees and PFCs (passenger facility charges), for a 15-year term expiring May 23, 2020. MDAD filed a claim against Falcon Air in the Chapter 11 Case (claim no. 88) asserting a total claim in the amount of $1,261,674.23, in respect of unpaid landing and aircraft parking fees, rentals, common use terminal equipment charges, employee parking decals and PFCs. MDAD asserts in the supplement attached to its claim that the Use Agreement is an executory contract and that the entire amount of its claim is payable by Falcon Air as a cure payment in the event Falcon Air continues to operate at MIA. MDAD's assertion is based on its position that Falcon Air will need to assume the Use Agreement under section 365 of the Bankruptcy Code as a condition to its continued operation at MIA.

The Trustee may contest the assertion by MDAD that the Use Agreement is executory under bankruptcy law. In addition, the Trustee is informed and believes that the existence of an airport usage agreement may not be a requirement for an airline to operate at MIA. If the Trustee and/or SkyValue and Reorganized Falcon Air decide to reject the Use Agreement, the

Trustee believes that MDAD's claim will be a substantially unsecured claim with a relatively small secured amount. Alternatively, SkyValue and Reorganized Falcon Air may consider negotiating a new agreement post-Confirmation for use of MIA without the assumption of the Use Agreement and payment of the asserted cure amount; the Trustee believes that SkyValue and Reorganized Falcon Air will be able to enter into a new usage agreement if they choose because MDAD would be prohibited, pursuant to section 525(a) of the Bankruptcy Code, from denying the Reorganized Debtor use of MIA based upon the Debtor's discharge of a substantial amount asserted in MDAD's claim. SkyValue, however, intends to negotiate a reduced cure amount with MDAD to the extent that it wishes to assume the Use Agreement under the Plan, and, in any event, will be responsible for payment of any required cure amount.

### 4.    Leased Facilities

Falcon Air's principal executive offices are located at 9500 N.W. 41st Street, Miami, Florida 33178 (the "Premises"). Falcon Air occupies the Premises under a month-to-month lease arrangement with its landlord, 9500 Building Ltd., for a monthly rent and tax escrow amount totaling $36,475.30. Additionally, Falcon Air executed a lease for a new facility at 9000 N.W. 15th Street, Miami, Florida (the "Lakes Edge Lease"). The term of the Lakes Edge Lease is five years, with base rent commencing at $23,395 per month and escalating to approximately $33,299 per month in year five. The Lakes Edge Lease also contains a purchase option, which essentially provides Falcon Air, as lessee, an option to purchase the facility upon certain conditions in the event of a conversion to condominiums.

The Trustee was required to pay the amount of $61,759.10 to Lakes Edge as a condition to Lakes Edge's consent to extend the time within which the Trustee could assume or reject the Lakes Edge Lease (through February 6, 2007) pursuant to section 365(d)(4)(B)(ii) of the Bankruptcy Code. The Court authorized the Trustee's rejection of the Lease effective as of February 6, 2006. Under the Stock Issuance and Plan Funding Agreement, SkyValue is paying the amount of $202,000 at Closing in respect of the Lakes Edge Lease rejection.

Additionally, Falcon Air leases certain warehouse space near the Miami airport and Lakes Edge facility for storage of aircraft parts under a month-to-month lease arrangement for rent of $2,184 per month, and certain office space at the Miami airport under a month-to-month lease for rent and other monthly charges of approximately $9,000 per month. The Debtor has remained current under these leases post-petition and any required cure amount will be paid by SkyValue in the event such leases are assumed under the Plan.

### 5.    Inventory and Parts

The Debtor owns a single aircraft engine and inventory consisting mainly of used aircraft parts. This inventory will vest in the Reorganized Debtor as of the Effective Date, with the exception of certain aircraft engines owned by Falcon Air and held by Hamilton Aerospace Technologies, Inc. or other third parties, which engines, and all causes of action related thereto, are among the Excluded Assets which will be transferred to the Liquidating Trust as of the Effective Date for the benefit of General Unsecured Creditors. Upon information belief, the liquidation value of the engine and inventory may be approximately $400,000 to $500,000.

6.    **Accounts Receivable**

Pursuant to the Aeropostal Settlement Agreement (described more fully below), Falcon Air has received $75,000 per week from Aeropostal for continued operation of the Leased Aircraft, plus an additional $500,000 in repayment of past-due arrearages under the Debt Settlement Agreement. In addition to the three "Arrearage Installment Payments" due under the Aeropostal Settlement Agreement, each of which was timely paid by Aeropostal, Aeropostal is required to pay the additional amount of $1.8 million to the estate in 18 monthly installments of $100,000 per month commencing December 15, 2006. To date, Aeropostal has paid the first two monthly "Discounted Balance Payments" totaling $200,000. From and after the Effective Date, payments received by the Liquidating Trustee in respect of the Outstanding Aeropostal Receivable will be turned over to the IRS in respect of its Allowed Class 2 Claim, subject to certain conditions set forth in Section 3.3 of the Plan. The Estate's other accounts receivable and certain other assets will be transferred into the Liquidating Trust on the Effective Date. As described in the Aeropostal Settlement Agreement, a copy of which is attached to the Plan as Exhibit C, the total amount of the Aeropostal Receivable will be $4 million in the event that Aeropostal fails to pay any of the "Discounted Balance Payments." The Trustee believes that the face amount of the Estate's other collectible receivables, not including Causes of Action, is approximately $175,000.

7.    **Cash and Certificates of Deposit**

As of the Petition Date, the Debtor maintained letters of credit backed by three certificates of deposit in the aggregate amount $128,015 at TotalBank, including a $100,000 letter of credit issued on behalf of Falcon Air in favor of its surety, Roanoke Trade Services, Inc. ("Roanoke Trade"), to secure fines and penalties asserted by U.S. Customs and Border Protection ("Customs"). Upon information and belief, Roanoke Trade holds a surety bond (no. 520104966) available for payment of fees and charges asserted by Customs (the "Customs Bond"). Upon information and belief, the other certificates of deposit back letters of credit issued by TotalBank in respect of other surety bonds to secure user fees, landing fees and other charges imposed by the Miami-Dade County Aviation Department. The Debtor's Cash on hand on the Effective Date (including the SkyValue Cash Consideration) will be used for Distributions to Holders of Allowed Claims and funding the Liquidating Trust pursuant to the terms of the Plan.

8.    **Causes of Action**

The Debtor's Causes of Action and Avoidance Actions against certain Persons which may be prosecuted for the benefit of the Estate will be among the Assets transferred to the Liquidating Trust on the Effective Date to be pursued by the Liquidating Trustee with any recoveries therefrom to be distributed exclusively to Allowed General Unsecured Creditors. These Causes of Action and Avoidance Actions are described more fully in Article V below. At this point, the Trustee cannot estimate the ultimate recovery to the Liquidating Trust from the prosecution of any Causes of Action.

## ARTICLE V
## CAUSES OF ACTION

The Debtor's Schedules identify creditors whose Claims are disputed, and the Debtor's Statement of Financial Affairs identifies the parties who received payments and transfers from the Debtor, which payments and transfers may be avoidable under the Bankruptcy Code. Moreover, the Trustee and Committee continue to investigate Avoidance Actions and Causes of Action that the Estate may have against third parties. The Trustee has not completed its investigation of potential objections to Claims, Avoidance Actions and Causes of Action; therefore, the Trustee is unable to provide any meaningful estimate of amounts that could be recovered for the benefit of General Unsecured Creditors under the Plan and Liquidating Trust Agreement. **THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY SUCH CAUSES OF ACTION, AVOIDANCE ACTIONS, OR OBJECTIONS TO CLAIMS. ALL SUCH RIGHTS ARE SPECIFICALLY PRESERVED IN FAVOR OF THE DEBTOR AND LIQUIDATING TRUST.**

Creditors should understand that legal rights, Claims and Causes of Action that the Debtor may have against them, if any exist, are retained under the Plan and will be transferred into the Liquidating Trust for prosecution by the Liquidating Trustee unless a specific order of the Court authorizes the Debtor to release such Claims. As such, creditors are cautioned not to rely on (i) the absence of the listing of any legal right, Claim or Cause of Action against a particular creditor in the Disclosure Statement, Plan, Schedules or Statement of Financial Affairs or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or Liquidating Trustee does not possess or does not intend to prosecute a particular right, claim or cause of action if a particular creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, Claims, and Causes of Action of the Debtor, whether now known or unknown, for the benefit of the Debtor's Estate and its creditors.

### A.    State/Common Law Causes of Action

Under the Plan, all of the Debtor's Causes of Action (i.e., claims against third parties) will be transferred to the Liquidating Trust for prosecution by the Liquidating Trustee. The claims that may be pursued post-Confirmation include Avoidance Actions (described in Article V.B. below) and possible claims against certain of the Debtor's former officers, including without limitation, Emilio Dirube, Lillian Dirube, EJ Dirube and James Sprinkle.

The Estate also holds claims against Icon International Holdings, Inc. ("Icon") and its principal Alan P. Brooks ("Brooks") for breach of contract, fraud and/or negligent misrepresentation in respect of Icon's breaches of certain provisions of the Stock Issuance and Plan Funding Agreement entered into between the Trustee and Icon on or about December 1, 2006 (the "Icon Agreement"), and Brooks' conduct in connection therewith. On January 24, 2007, the Trustee commenced an adversary proceeding against Icon and Brooks in the Chapter 11 Case, adv. no. 07-1032-BKC-AJC (the "Icon/Brooks Adversary"), by filing a complaint asserting claims for damages and injunctive relief. The Trustee intends to amend the Complaint to add counts for fraudulent and negligent misrepresentation with respect to certain misrepresentations made by Icon and Brooks under paragraph 16 of the Icon Agreement, and the rights of the Trustee and/or Liquidating Trustee to do so are expressly reserved. A detailed

description of Icon's defaults and misrepresentations under the Icon Agreement is contained in the default letter sent by the Trustee to Icon on December 21, 2006 (the "Icon Default Letter"), which is attached to the Complaint as Exhibit B. The Trustee is engaged in discovery with Icon and Brooks and intends to fully prosecute the Icon/Brooks Adversary and any other available claims against Icon and Brooks (and any other Person related thereto), and the rights of the Trustee and Liquidating Trustee to prosecute such claims are preserved for the benefit of the Estate and Liquidating Trust.

Other potential claims include, without limitation, breach of fiduciary duty, corporate waste and deepening insolvency relating to certain pre-petition conduct and actions taken by the Debtor's former officers. The Liquidating Trustee may also pursue claims against any professionals, advisors, consultants or other Persons who may have assisted such former officers in the misconduct that gives rise to such claims, as either principal tortfeasors or under an aiding and abetting theory. In addition to any state law of federal common law claims outlined above, the Liquidating Trustee may pursue preferential and/or fraudulent transfer claims against the aforementioned insiders and other third parties for avoidance and recovery of certain pre-petition transfers made to such Persons by Falcon Air, as discussed in more detail below, and such claims shall be preserved for the benefit of the Estate and Liquidating Trust. Such claims include, without limitation, fraudulent transfer (under the Bankruptcy Code and/or Florida law), aiding and abetting breach of fiduciary duty and other claims against Sol Air and/or Aero Honduras, and any of their officers, directors or principals, relating to a substantial account receivable written off by Falcon Air for inadequate consideration prior to the Petition Date.

The Trustee commenced a Bankruptcy Rule 2004 examination of Emilio Dirube on September 15, 2006, but has not completed such examination as of the date of this Disclosure Statement. The Trustee or Liquidating Trustee, as the case may be, intend to continue such Rule 2004 examination upon reasonable notice to Mr. Dirube and reserve theirs rights to take further discovery and prosecute any available Causes of Action against Mr. Dirube, any other former Falcon Air officers or directors including those identified above, or any other Persons that may be identified through further discovery, and such claims shall be preserved for the benefit of the Estate and Liquidating Trust.

Additionally, the Trustee and Committee believe that grounds may exist to seek the equitable subordination of JetGlobal's DIP financing claim under section 510(c) of the Bankruptcy Code in addition to claims for damages against JetGlobal, and its affiliates and related persons and entities, arising from certain alleged misconduct in its transactions relating to the Debtor. The Trustee, Committee and Liquidating Trustee reserve their rights to prosecute any available claims or defenses against JetGlobal, and its affiliates and related persons or entities, for damages or other relief, including without limitation equitable subordination, fraud and bad faith, in respect of its transactions relating to the Debtor, and such claims shall be preserved for the benefit of the Estate and Liquidating Trust.

On January 22, 2007, the Trustee commenced an adversary proceeding (adv. no. 07-1027-BKC-AJC) against Wilson International Services, Inc. ("Wilson International"), the Debtor's former customer under certain passenger charter agreements, asserting a damages claim for past-due amounts totaling $101,123.90 owed by Wilson International under the charter

agreements (the "Wilson Adversary"). The Trustee intends to fully prosecute the Wilson Adversary as well as the Estate's claims for other outstanding receivables including, without limitation, those identified on Exhibit 3 attached hereto, and such claims shall be preserved for the benefit of the Estate and Liquidating Trust.

Upon information and belief, Falcon Air has no available directors' and officers' liability coverage.

## B.    Avoidance Actions

During the 90-day period immediately preceding the Petition Date, while insolvent, Falcon Air made various payments and other transfers to creditors on account of antecedent debts. In addition, during the one-year period before the Petition Date, Falcon Air made certain transfers to, or for the benefit of, certain "insider" creditors. Some of those payments may be subject to avoidance and recovery by Falcon Air's bankruptcy estate as preferential and/or fraudulent transfers pursuant to Bankruptcy Code sections 544, 547, 548 and 550. All claims, causes of action, and other legal and equitable rights that the Debtor had (or had power to assert) immediately prior to confirmation of the Plan, including actions for the avoidance and recovery of estate property under Bankruptcy Code sections 329 and 550, or transfers avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549 or 553(b), will be transferred into the Liquidating Trust as of the Effective Date, and the Liquidating Trustee may commence or continue, in any appropriate court or tribunal, any suit or other proceeding for the enforcement of such actions for the benefit of Allowed Class 10 General Unsecured Creditors as beneficiaries of the Liquidating Trust.

Based upon information provided by the Debtor and available to the Trustee, the Trustee and his professionals have prepared schedules of (i) payments made by Falcon Air within the 90-day pre-petition period and payments to insiders within one year pre-petition, which payments may be subject to avoidance and recovery as preferential transfers pursuant to sections 547 and 550 of the Bankruptcy Code, and (ii) payments made by Falcon Air to certain Persons within four years pre-petition, which payments may be subject to avoidance and recovery pursuant to sections 544 and/or 548 and 550 of the Bankruptcy Code. These schedules of pre-petition payments are attached hereto as composite Exhibit 4.[8] The Trustee and Liquidating Trustee reserve their rights to prosecute actions against the Persons identified in the schedules attached hereto as Exhibit 4 for the avoidance and recovery of the pre-petition transfers identified therein, and for any other available claims learned through discovery or otherwise, and such claims shall be preserved for the benefit of the Estate and Liquidating Trust.

---

[8]    The schedules attached hereto as Exhibit 4 were prepared by the Trustee and his professionals based upon information made available to the Trustee from the Debtor's books and records. The Trustee and his professionals make no representations regarding the accuracy or completeness of the information contained therein. Further, the Trustee and his professionals have not completed an analysis of potential defenses and other collectibility issues with respect to any avoidable and recoverable transfers identified in the schedules attached hereto as Exhibit 4, and make no representations or estimates regarding the ultimate recovery in respect of any Avoidance Actions.

## ARTICLE VI
## POST-PETITION OPERATIONS AND
## SIGNIFICANT EVENTS DURING CHAPTER 11 CASE

**A.     Post-Petition Operations**

From the Petition Date through approximately June 23, 2006, Falcon Air operated its business and managed its affairs as a debtor in possession under 11 U.S.C. §§ 1107 and 1107. On or about June 26, 2006, Kenneth A. Welt was appointed Chapter 11 Trustee for Falcon Air pursuant to 11 U.S.C. § 1104, vested with the powers and duties set forth in 11 U.S.C. § 1106 and the authority to operate the business and manage the affairs of the Debtor pursuant to 11 U.S.C. § 1108.  Mr. Welt has continued to operate Falcon Air's business as Trustee since his appointment in close consultation with his Professionals and the Committee.

For detailed financial information regarding Falcon Air's post-petition operations, creditors and parties in interest are directed to the monthly operating reports filed with the Bankruptcy Court, which may be obtained from the Court's electronic docket or by sending a written request to the Trustee's counsel.

**B.     First Day Orders**

On or shortly after the Petition Date, the Debtor filed a number of motions designed to allow it to continue operating its business in the ordinary course without unnecessary disruption as a result of the bankruptcy filing.  Pursuant to these "first-day" motions, the Bankruptcy Court entered orders that, among other things, gave the Debtor the authority to:

- Establish certain notice, case management and administrative procedures (C.P. No. 32);[9]

- Retain Berger Singerman, P.A. as their general bankruptcy counsel (C.P. No. 21);

- Extend the period during which utility companies may not alter, refuse, or discontinue services to the Debtors (C.P. No. 27); and

- Pay accrued pre-petition wages, salaries, medical benefits, and reimbursable employee expenses (C.P. No. 28).

In addition to the foregoing, the Bankruptcy Court has entered various orders authorizing the rejection of certain aircraft and equipment leases to reduce the administrative expenses burden to the Estate.

**C.     Creditors' Committee**

On May 22, 2006, the United States Trustee filed an Appointment and Notice of Appointment of Committee of Creditors Holding Unsecured Claims in the Falcon Case.  The

---

[9]     References to "C.P. No. ___" herein refer to the numerical entries on the Court's docket in the Chapter 11 Case.

membership of the Committee was reconstituted several times after the initial appointment and currently consists of the following members:

| Falcon Air Unsecured Creditors' Committee | |
|---|---|
| Philip V. Jackmauh, Co-Chairperson | Pals I, Inc. c/o Pegasus Aviation, Inc. |
| David M. Sandri | Commercial Jet, Inc. |
| Fred Adarve | Aviation Brake Services, Inc. |
| David Leamon (subsequently replaced by Robert Gallagher), Co-Chairperson | Aviation Refinancing Transaction, LLC |
| James Raff | RPK Capital I, LLC |
| Roberto Ruales | Former Falcon Air Pilot |

### D.    Employment of Professionals

Pursuant to orders entered by the Bankruptcy Court, the following professionals have been retained in the Chapter 11 Case pursuant to sections 327, 328 and/or 1103 of the Bankruptcy Code, compensable by the Estate pursuant to section 330 of the Bankruptcy Code:

| Professional | Role | Estimated Outstanding Fees through 3/15/07 |
|---|---|---|
| Berger Singerman, P.A. | Debtor's Counsel | $60,000 |
| Crisis Management, Inc. | Debtor's Limited Financial Advisor | $20,000 (disputed; under court consideration) |
| Meland, Russin & Budwick, P.A. | Committee's Counsel | $350,000 |
| Katz Barron Squitero Faust | Trustee's Counsel | $675,000 |
| Rachlin, Cohen & Holtz LLP | Trustee's Financial Consultants | $30,000 |
| Kapila & Co. | Trustee's Accountants | $110,000 |
| Sher & Blackwell | Trustee's Special Aviation Counsel | $85,000 |
| Kenneth A. Welt | Chapter 11 Trustee | $285,000 (Section 326(a) commission) |
| Adorno & Yoss, LLP | Counsel to Aviation Refinancing Transaction LLC | $45,000 (Section 503(b)(4) substantial contribution claim) |

The Professional Claims of these retained Professionals will be paid at Confirmation pursuant to separate Order of the Bankruptcy Court. As detailed in the above schedule, the Trustee estimates that the total amount of Allowed Professional Claims payable at Confirmation will be approximately $1.66 million.

### E.    Schedules and Statement of Financial Affairs

Falcon Air filed its Schedules and Statements of Financial Affairs on June 14, 2006, C.P. No. 103, describing in detail its the nature and extent of its assets and liabilities as of the Petition Date, and its pre-petition financial affairs.

### F.    JetGlobal DIP Credit Facility

On May 19, 2006, the Bankruptcy Court entered an interim order (C.P. No. 41) authorizing the Debtor to enter into a certain debtor-in-possession financing arrangement to borrow the amount of $350,000 from JetGlobal, LLC ("JetGlobal") on a post-petition basis and

to grant first priority liens in its assets to secure such borrowings pursuant to 11 U.S.C. § 364(d). The Debtor borrowed these funds from JetGlobal though a final hearing on the DIP financing was never held. The $350,000 principal amount of the loan plus interest and costs have been asserted by JetGlobal as an Administrative Claim. JetGlobal also asserts that it holds a Secured Claim in respect of this loan, which Claim, albeit disputed by the Trustee and Committee for the reasons set forth herein, is classified in Impaired Class 8 under the Plan. The Trustee and Committee believe that JetGlobal's claim in respect of the DIP financing may be subject to equitable subordination under section 510(c) of the Bankruptcy Code based upon certain alleged misconduct by JetGlobal in connection with the transactions that give rise to such claim. The Trustee, Committee and Liquidating Trustee reserve their rights to prosecute any available claims or defenses against JetGlobal, and its affiliates and related persons or entities, for damages or other relief, including without limitation equitable subordination, fraud and bad faith, in respect of its transactions relating to the Debtor.

### G.    IRS Cash Collateral Agreements

The Trustee believes that certain Cash received by the Trustee post-petition from Aeropostal as payment of certain amounts owing under the Aeropostal Debt Settlement Agreement, which is a pre-petition receivable likely encumbered by the IRS's pre-petition secured tax lien, constitutes the IRS's "cash collateral" within the meaning of section 363 of the Bankruptcy Code, and had acted in accordance with that position during the Chapter 11 Case. In particular, the Trustee has negotiated four interim cash collateral agreements with the IRS, memorialized in the form of agreed orders entered by the Bankruptcy Court (C.P. Nos. 184, 381, 401 and 517), allowing the Trustee to use the Aeropostal debt settlement payments in consideration of certain adequate protection provided to the IRS under sections 361 and 363 of the Bankruptcy Code, including period cash payments to the IRS. A final cash collateral hearing is scheduled for March 5, 2007, at 10:00 a.m., at which the Trustee may seek further uses of cash collateral in respect of payments due under the Aeropostal Settlement Agreement or otherwise.

### H.    Aeropostal Settlement Agreement

By a Settlement Agreement dated as of October 2, 2006, and approved by the Court by Order entered October 19, 2006 (C.P. No. 382), the Trustee and Aeropostal reached a global settlement of a number of disputes regarding Falcon Air's continued operation of the Aeropostal aircraft under the sublease and operating agreements and Aeropostal's defaults under the Aeropostal Debt Settlement Agreement. The significant terms of the Aeropostal Settlement Agreement, as amended by an Amendment dated as of December 4, 2006 and filed with the Court (C.P. No. 443) are as follows:

- **Termination of Aeropostal Agreements**. The Aeropostal Agreements shall terminated on January 31, 2007 (the "Termination Date"),[10] pending which date the Trustee and Falcon Air may operate the Leased Aircraft while Aeropostal continues

---

[10]    Aeropostal and the Trustee subsequently agreed that Falcon Air would continue to fly charters for Aeropostal under the Aeropostal Agreements through February 17, 2007, and possibly through Confirmation if agreed to by the parties.

to make the required $75,000 weekly payments (capped at $300,000 per month for months of December, 2006 and January, 2007).

- **Surrender of Leased Aircraft on Termination Date.** Provided that Aeropostal has fully paid each Weekly Payment and Arrearage Installment Payment (defined below), the Trustee shall surrender and return the Leased Aircraft to Aeropostal, including the books and records and all Aeropostal-owned spare parts relating to the Leased Aircraft, on the Termination Date. The expense of surrendering and returning the Leased Aircraft to Aeropostal shall be paid by Aeropostal.

- **Aeropostal Payments under Debt Settlement Agreement.** In full payment and satisfaction of all outstanding amounts due and owing under the Debt Settlement Agreement as of November 30, 2006, Aeropostal shall pay the total amount of $500,000 to the Trustee in the following three (3) installments: (i) the amount of $100,000 due and payable on or before October 10, 2006; (ii) the amount of $150,000 due and payable on or before October 31, 2006; and (iii) the amount of $250,000 due and payable on or before November 29, 2006 (collectively, the "Arrearage Installment Payments"). Upon Aeropostal's full and timely payment of the Arrearage Installment Payments, the outstanding balance owed by Aeropostal to the Trustee under the Debt Settlement Agreement shall be the amount of $2.5 million (the "Outstanding Balance"). The Outstanding Balance shall be satisfied by Aeropostal paying the amount of $100,000 per month to the Trustee, on the fifteenth (15th) day of each month for a period of 18 months commencing December 15, 2006, with a 15-day grace period for each monthly payment (collectively, the "Discounted Balance Payments"), for a total discounted payment of $1.8 million. Upon Aeropostal's full and timely payment of the Discounted Balance Payments, the Outstanding Balance shall be deemed fully paid and satisfied.

- **Aeropostal's Waiver of Claims.** Aeropostal shall waive any and all pre-petition claims against Falcon Air.

- **Default Rights.** In the event of Aeropostal's default of any of the Weekly Payments or Arrearage Installment Payments, the entire amount due under the Aeropostal Debt Settlement Agreement, less any amounts actually paid, will become immediately due and payable. If Aeropostal pays all the Weekly Payments and Arrearage Installment Payments but thereafter defaults on any of the Discounted Balance Payments, then the accelerated principal balance that comes immediately due and payable is $4.0 million less any Discounted Balance Payments actually paid by Aeropostal. Aeropostal agrees to accept service in the U.S. and waive all defenses, other than payment, in the event of any lawsuit commenced for breach of its obligations under the Agreement.

The Aeropostal Settlement Agreement is attached to the Plan as Exhibit C and expressly incorporated as a part thereof. The Estate's rights under the Aeropostal Settlement Agreement, including the right to receive payments thereunder and sue Aeropostal in the event of default, will be transferred to the Liquidating Trust as of the Effective Date; provided, however, that all payments received by the Liquidating Trustee from Aeropostal in respect of the Outstanding

Aeropostal Receivable from and after the Effective Date will be turned over to the IRS in partial satisfaction of the IRS's Allowed Class 2 Claim, subject to certain conditions set forth in Section 3.3 of the Plan. As of the date of this Disclosure Statement, Aeropostal was current with all Weekly Payments and had paid all Arrearage Installment Payments and the first two monthly Discounted Balance Payments of $100,000 each due under the Aeropostal Settlement Agreement.

## I.    Icon Agreement and First Chapter 11 Plan

The Trustee and Icon entered into the Icon Agreement on or about December 1, 2006. The president of Icon is Mr. Alan Brooks. The Icon Agreement essentially provided that Icon would acquire 100 % of the capital stock of reorganized Falcon Air for total consideration equal to at least $4.2 million ($3 million cash plus Icon common stock with a guaranteed minimum value of $1.2 million). Under paragraph 7 of the Agreement, a cash deposit totaling $600,000 was due and payable by Icon immediately upon execution of the Icon Agreement. Icon failed to pay the required deposit and remains in continuing default of its payment obligations under the Icon Agreement. Additionally, Icon and Brooks breached a number of representations and warranties contained in paragraph 16 of the Icon Agreement, as detailed in the Icon Default Letter.

The Trustee commenced the Icon/Brooks Adversary on January 24, 2007, asserting claims arising from Icon's payment defaults under the Icon Agreement, and intends to amend the Complaint to add counts for fraud and negligent misrepresentation.

The Trustee's Chapter 11 Plan of Reorganization filed November 30, 2006, C.P. No. 417 (the "First Chapter 11 Plan"), incorporated the Icon Agreement and provided that the Debtor's existing common stock would be canceled and extinguished while Icon would acquire the Reorganized Debtor's capital stock on the effective date of the plan. Due to Icon's failure to fund the deposits due upon execution of the Icon Agreement, and its continuing defaults thereunder, the Trustee withdrew the First Chapter 11 Plan.

## J.    SkyValue Stock Issuance and Plan Funding Agreement

The Trustee and SkyValue entered into the Stock Issuance and Plan Funding Agreement on February 9, 2007, which essentially provides that SkyValue, a Florida corporation, will acquire the Reorganized Debtor's capital stock through Confirmation of the Plan. The significant terms of the Agreement, copy of which is attached to the Plan as Exhibit A and fully incorporated therein, are summarized as follows:

- **Acquisition of Reorganized Falcon Air Stock**. At Closing, the Trustee shall issue 100% of the capital stock of Reorganized Falcon Air to SkyValue, which will result in SkyValue owning and controlling Reorganized Falcon Air.

- **Cash Consideration**. At Closing, SkyValue will pay the Estate (i) a Cash purchase price of $3.3 million, plus (ii) the amount of $202,000 in respect of the rejection of the Lakes Edge Lease, plus (iii) the amount of $350,000 earmarked for payment of Allowed Administrative Expense Claims under the Plan.

33

- **Deposit.** The total deposit payable by SkyValue is 20% of the purchase price; pursuant to paragraph 7 of the Agreement, SkyValue paid 50% of the deposit upon execution of the Agreement and the remaining 50% of the deposit is due on or before the service of the Plan and this Disclosure Statement upon creditors. The deposit shall be credited against the cash purchase price at closing except as otherwise provided in the Agreement.

- **Excluded Assets.** Certain of the Debtor's assets, specifically enumerated and defined in Article I of the Plan as the "Excluded Assets," will not vest in the Reorganized Debtor and will be transferred to the Liquidating Trust on the Effective Date.

- **Assumed Contracts.** Not later than 10 days prior to the Confirmation Hearing, SkyValue shall designate in writing those Executory Contracts that SkyValue wishes the Trustee to assume under the Plan. All required cure amounts payable in respect of the Assumed Contracts shall be satisfied by SkyValue without credit against or reduction of the cash purchase price.

- **Closing Date.** Closing shall occur on the eleventh day after entry of the Confirmation Order (provided that no stay is in effect), or sooner at SkyValue's election, and shall be the same date as the Effective Date subject to the conditions to occurrence of the Effective Date set forth in Section 9.1 of the Plan. The Agreement is terminable by either party if the Confirmation Order is not entered by March 5, 2007, or the Closing does not occur by March 15, 2007 and neither party is in default (unless such dates are extended by written consent of the parties).

- **Conditional Expense Reimbursement.** In the event the Trustee terminates the Agreement pursuant to paragraph Section 17(f) thereof, SkyValue shall be entitled, upon application to the Court, to its reasonable fees and expenses incurred in connection with the Agreement.

## ARTICLE VII
## SUMMARY DESCRIPTION OF THE PLAN

### A.    Introduction

A summary of the principal provisions of the Plan and the treatment of Classes of Allowed Claims and Allowed Equity Interests is outlined below. This Disclosure Statement is only a summary of the terms of the Plan; the Plan (and not the Disclosure Statement) governs the rights and obligations of the parties.

### B.    Designation of Claims and Equity Interests/ Impairment

The following is a designation of the Classes of Claims and Equity Interests under the Plan. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified and are excluded from the following Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in another Class(es)

34

to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class(es). A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Equity Interest that is not an Allowed Claim or Equity Interest is not in any Class. Notwithstanding anything to the contrary in the Plan, no Distribution shall be made on account of any Claim that is not an Allowed Claim.

Classes of Claims against and Equity Interests in Falcon Air are designated as follows:

| | |
|---|---|
| Class 1: | Priority Non-Tax Claims |
| Class 2: | IRS Secured and Priority Claims |
| Class 3: | DOJ Trust Fund Claims |
| Class 4: | DFAS Secured Claim |
| Class 5: | USDA Secured Claim |
| Class 6: | Security Deposit Claims |
| Class 7: | Secured Financing Claims |
| Class 8: | JetGlobal Secured DIP Financing Claim |
| Class 9: | Other Secured Claims |
| Class 10: | General Unsecured Claims |
| Class 11: | Equity Interests |

Allowed Priority Non-Tax Claims in Class 1, the Allowed DFAS Secured Claim is Class 4, the Allowed USDA Secured Claim in Class 5, Allowed Security Deposit Claims in Class 6, Allowed Secured Financing Claims in Class 7 and Allowed Other Secured Claims in Class 9 are not Impaired under the Plan. Pursuant to Bankruptcy Code section 1126(f), Holders of Claims within these Classes are conclusively presumed to have accepted the Plan and therefore are not entitled to vote to accept or reject the Plan. All Claims and Equity Interests other than those in Classes 1, 4, 5, 6, 7 and 9 are Impaired under the Plan. The Holders of Claims in Classes 2, 3, 8 and 10 are Impaired and are entitled to receive or retain property under the plan and thus may vote to either accept or reject the Plan. Except as otherwise specified in the Bankruptcy Code and/or Bankruptcy Rules, pursuant to Bankruptcy Code section 1126(g). Holders of Claims and Interests in those Classes are entitled to vote to accept or reject the Plan. The Holders of Allowed Equity Interests in Class 11 are Impaired, but will not receive any distribution under the Plan and therefore are not entitled to vote to accept or reject the Plan.

## C.    Treatment of Unclassified Claims

**1.    Allowed Administrative Claims.** Subject to the allowance procedures and deadlines provided in the Plan and except as otherwise provided in the Plan or Order of the Bankruptcy Court, each Holder of an Allowed Administrative Claim shall receive on account of such Claim and in full satisfaction, settlement, release and discharge of and in exchange for such Claim (a) Cash in an amount equal to the full amount of the Allowed Administrative Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the Allowance Date, and (iii) another date agreed to by the Trustee or Disbursing Agent and the Holder of such Administrative Claim; or (b) such other treatment on such other terms and conditions as may be agreed to in writing by the Trustee or Disbursing Agent and the Holder of such Claim, as the

case may be, or as the Bankruptcy Court may order. However, (i) Allowed Administrative Claims with respect to Ordinary Course Liabilities incurred by the Debtor or Trustee in the ordinary course of business during the Chapter 11 Case shall be paid in accordance with Section 2.2 of the Plan, (ii) Allowed Professional Claims shall be paid in accordance with Section 2.3 of the Plan, (iii) U.S. Trustee Fees shall be paid in accordance with Section 2.4 of the Plan, and (iv) Allowed Cure Claims shall be paid in accordance with Section 4.4 of the Plan.

2.    **Ordinary Course Liabilities.** At the Trustee's option, Ordinary Course Liabilities shall either be paid (i) pursuant to the payment terms and conditions of the particular agreement giving rise to the Ordinary Course Liability or the parties' course of dealing relating thereto, or (ii) on the Effective Date. With respect to expenses incurred in the normal course of their business with the Debtor or Trustee, Holders of Claims in respect of Ordinary Course Liabilities will not be required to file or serve any request for payment of such Claims. All Ordinary Course Liabilities that are the obligation of the Trustee and Estate under the Stock Issuance and Plan Funding Agreement shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date. All Ordinary Course Liabilities that are the obligation of the Reorganized Debtor under the Stock Issuance and Plan Funding Agreement shall be paid by the Reorganized Debtor.

3.    **Professional Claims.** Each Professional in the Chapter 11 Case will file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Confirmation Date by the deadline set by separate Order of the Bankruptcy Court. Any Professional Claim for which an application or other request for payment is not filed by such deadline shall be discharged and forever barred. All Allowed Professional Claims shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date.

4.    **U.S. Trustee Fees.** The Trustee will pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten (10) days from the entry of an order confirming the Plan for pre-Confirmation periods and simultaneously provide to the U.S. Trustee an appropriate affidavit indicating the cash disbursements for the relevant period. In addition, the Liquidating Trustee and Disbursing Agent will pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements made by the Liquidating Trustee and Disbursing Agent in connection with all payments made pursuant to the Plan, until the earlier of the closing of this case by the issuance of a final decree by the Bankruptcy Court, or upon the entry of an order by the Bankruptcy Court dismissing the Chapter 11 Case or converting the case to another chapter under the Bankruptcy Code, and the Liquidating Trustee and Disbursing Agent will provide to the U.S. Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all cash disbursements for the relevant period. All post-Confirmation U.S. Trustee Fees shall be paid by the Disbursing Agent (from the SkyValue Cash Consideration and Cash on hand on the Effective Date) or Liquidating Trustee out of the Liquidating Trust Expenses.

5.    **Priority Tax Claims.** Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall receive on account of such Claim and

in full satisfaction, settlement, release and discharge of and in exchange for such Claim (a) **Cash in an amount equal** to the full amount of the Allowed Priority Tax Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the Allowance Date, and (iii) another date agreed to by the Trustee or Disbursing Agent and the Holder of such Priority **Tax** Claim; or (b) such other treatment on such other terms and conditions as may be agreed to in writing by the Trustee or Disbursing Agent and the Holder of such Claim, as the case may be, or as the Bankruptcy Court may order. All Allowed Priority Tax Claims shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date. **The Trustee estimates that the allowable amount of Priority Tax Claims (does not include IRS Priority Claim) will not exceed approximately $6,000.**

   **6.**  **Administrative Claims Bar Date.** All applications or other requests for payment of Administrative Claims arising on or before the Confirmation Date (other than Professional Claims, Ordinary Course Liabilities, Cure Claims and U.S. Trustee Fees) must have been filed with the Bankruptcy Court and served on the Trustee by the Administrative Claims Bar Date. Any Administrative Claim for which an application or request for payment is required and not filed by the Administrative Claims Bar Date (January 15, 2007) in accordance with the Administrative Claims Bar Date Order shall be discharged and forever barred.

  **The Trustee estimates that the allowable amount of Administrative Claims outstanding as of the Effective Date may total up to $3.1 million.**

  **D.**  **Treatment of Classified Claims and Interests**

   Pursuant to section 1122 of the Bankruptcy Code, a designation of the Classes of Claims and Interests regarding the Debtor are listed below. A Claim or Equity Interest is designated in a particular Class only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. The treatment of and consideration to be received by Holders of Allowed Claims and the treatment of Interests pursuant to the Plan will be in full satisfaction, settlement, release and extinguishment of their respective Allowed Claims against, or Equity Interests in the Debtor and the Debtor's Estate, except as otherwise expressly provided in the Plan or the Confirmation Order.

1.    **Class 1: Priority Non-Tax Claims (Unimpaired).**  Class 1 consists of all Allowed Claims given priority in payment pursuant to section 507 of the Bankruptcy Code, but not including Priority Tax Claims.  In accordance with section 1129(a)(9)(B) of the Bankruptcy Code, each Holder of an Allowed Class 1 Claim shall receive either (a) Cash in an amount equal to the Allowed amount of its Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date, (ii) the Allowance Date, and (iii) another date agreed to by the Trustee or Disbursing Agent and such Holder; or (b) such other treatment on such other terms and conditions as may be agreed to in writing by the Trustee or Disbursing Agent and such Holder, as the case may be, or as the Bankruptcy Court may order.  All Allowed Priority Non-Tax Claims shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date.  Class 1 is Unimpaired and not entitled to vote on the Plan.  **The Trustee estimates that the allowable amount of Class 1 Claims should not exceed approximately $110,000.**

2.    **Class 2: IRS Secured and Priority Claims (Impaired).**  Class 2 consists of the Claim against the Debtor held by the IRS.  The IRS shall receive (i) a Distribution of all Cash in the Estate (including the SkyValue Cash Consideration) on the Effective Date after payment, or establishment of an appropriate reserve for payment, of all Allowed Administrative Claims, Allowed Priority Claims, the Allowed USDA Secured Claim and the amount of $200,000 to the Liquidating Trust earmarked for payment of Liquidating Trust Expenses; plus (ii) the payments received by the Liquidating Trustee in respect of the Outstanding Aeropostal Receivable; provided, however, that in the event that Aeropostal defaults under the Aeropostal Settlement Agreement, then either (a) the IRS and Liquidating Trustee will either negotiate an agreement regarding the enforcement of the Aeropostal Settlement Agreement and collection of the Aeropostal Receivable or (b) the Liquidating Trustee will transfer or abandon his rights under the Aeropostal Settlement Agreement (including his rights to the Aeropostal Receivable) to the IRS.  The Cash Distribution payable to the IRS on the Effective Date shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date.  The treatment proposed herein shall be in full satisfaction and discharge of the IRS Secured Claim and IRS Priority Claim; any deficiency amount shall be waived except that the IRS will hold an Allowed Class 10 General Unsecured Claim in the amount of $47,480.61.  Class 2 is Impaired and entitled to vote on the Plan.

3.    **Class 3: DOJ Trust Fund Claims (Impaired).**  Class 3 consists of all Claims held by U.S. Customs and Border Protection, Transportation Security Administration and USDA to the extent that such Claims reflect statutory trust fund fees.  In respect of the DOJ Trust Fund Claims, the DOJ, on behalf of the Holders of the DOJ Trust Fund Claims, shall (i) receive a portion of the aggregate Distribution payable to the IRS under the Plan, in an amount to be agreed upon between the IRS and DOJ; (ii) retain any rights of recovery from the Customs Bond and any available proceeds thereof; and (iii) hold an Allowed Class 10 General Unsecured Claim for the outstanding balance of the Allowed DOJ Trust Fund Claims after application of its Cash payment received from the IRS and the any available Customs Bond proceeds.  The Cash distribution payable to the DOJ under clause (i) above shall be paid solely by the IRS; neither the Trustee, Disbursing Agent, Liquidating Trustee nor the Estate shall have any liability for such distribution.  Class 3 is Impaired and entitled to vote on the Plan.

**4.    Class 4:  DFAS Secured Claim (Unimpaired).**  Class 4 consists of the Secured Claim held by DFAS (claim no. 143).  DFAS shall be entitled to assert any valid right of setoff in full and complete satisfaction of its Allowed Secured Claim.  Class 4 is Unimpaired and not entitled to vote on the Plan.

**5.    Class 5:  USDA Secured Claim (Unimpaired).**  Class 5 consists of the Secured Claim held by USDA for certain aircraft inspection fees under 21 U.S.C. § 136a(c)(5). USDA shall receive a Cash Distribution in the full amount of its Allowed Secured Claim on, or as soon as reasonably practicable after, the later of the Effective Date or Allowance Date in full and complete satisfaction of its Allowed Secured Claim.  The Cash distribution payable to USDA on the Effective Date shall be paid by the Disbursing Agent from the SkyValue Cash Consideration and Cash on hand on the Effective Date.  Class 5 is Unimpaired and not entitled to vote on the Plan.  **The USDA Secured Claim was filed in the amount of $10,672.57.**

**6.    Class 6: Security Deposit Claims (Unimpaired).**  Class 6 consists of each Allowed Secured Claim that is secured by a security deposit held by the Holder of such Claim to secure the Debtor's payment obligations in respect of such Claim, including (to the extent Allowed) the Security Deposit Claims filed by (i) Miami-Dade Aviation Department in the amount of $17,545.83 (included in claim no. 88), (ii) MSA V c/o AWAS Aviation in the amount of $250,000 (included in claim no. 103), (iii) Arinc Inc. in the amount of $16,297.00 (claim no. 113), (iv) National Union Fire Insurance Company of Pittsburgh P.A., et al (claim no. 131), and any other Allowed Security Deposit Claims.  Each Holder of an Allowed Class 6 Security Deposit Claim shall receive and retain the security deposit securing its Claim in full and complete satisfaction of its Allowed Secured Claim.  Class 6 is Unimpaired and not entitled to vote on the Plan.

**7.    Class 7:  Secured Financing Claims (Unimpaired).**  Class 7 consists of Allowed Secured Claims held by parties to secured financing agreements with the Debtor and secured by collateral that will vest in the Reorganized Debtor on the Effective Date, including (to the extend Allowed) the Secured Financing Claims filed by (i) Ford Motor Credit Company (claim nos. 136 and 137) and governed by the Court's Corrected Order on Ford Motor Credit Company Relief From Stay, C.P. No. 311; (ii) First Insurance Funding Corp. (claim no. 128), and any other Allowed Secured Financing Claims.  Each Holder of an Allowed Class 7 Secured Financing Claim shall receive, at the option of the Trustee or Disbursing Agent, one of the following forms of treatment in full and complete satisfaction of its Allowed Secured Claim: (i) retain its lien or security interest in all Property that secures the Allowed Class 7 Claim, and the Reorganized Debtor shall perform the Debtor's obligations in accordance with the agreement(s) and/or Court order(s) that give rise to such Allowed Class 7 Claim; (ii) receive the collateral which secures its Claim; or (iii) receive such other treatment as agreed to between the Reorganized Debtor and such Holder.  Any deficiency claims in respect of Allowed Class 7 Claims will be treated as Class 10 General Unsecured Claims.  Class 7 is Unimpaired and not entitled to vote on the Plan.

**8.    Class 8:  JetGlobal Secured DIP Financing Claim (Impaired).**  Class 8 consists of the alleged Secured Claim held by JetGlobal in respect of its post-petition loan advanced to the Debtor, which Claim is disputed by the Trustee.  JetGlobal shall receive a Cash

Distribution in the full amount of its Allowed Secured Claim on, or as soon as reasonably practicable after, the later of the Effective Date or Allowance Date in full and complete satisfaction of its Allowed Secured Claim. Class 8 is Impaired and entitled to vote on the Plan.

9.    **Class 9: Other Secured Claims (Unimpaired).** Class 9 consists of any Allowed Secured Claims other than the IRS Secured Claim, DFAS Secured Claim, USDA Secured Claim, Security Deposit Claims and Secured Financing Claims. Each Holder of an Allowed Class 9 Other Secured Claim shall receive, at the option of the Trustee or Reorganized Debtor as applicable, one of the following forms of treatment in full and complete satisfaction of its Allowed Secured Claim:

(a)    The Trustee or Disbursing Agent shall pay to the Holder Cash equal to the amount of its Allowed Secured Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the Allowance Date, from the SkyValue Cash Consideration and Cash on hand on the Effective Date;

(b)    The Trustee or Disbursing Agent shall abandon the Property that secures the Allowed Class 9 Claim to the Holder of such Claim on, or as soon as reasonably practicable after, the later of (i) the Effective Date and (ii) the Allowance Date;

(c)    The Holder of the Allowed Class 9 Claim shall retain its lien or security interest in all Property that secures the Allowed Class 9 Claim, and the Reorganized Debtor shall perform the Debtor's obligations in accordance with the documents that give rise to such Allowed Class 9 Claim; or

(d)    The Trustee, Disbursing Agent or Reorganized Debtor shall provide such other treatment as the Trustee, Disbursing Agent or Reorganized Debtor and such Holder shall have agreed upon in writing.

Class 9 is Unimpaired and not entitled to vote on the Plan. Any deficiency claims in respect of Allowed Class 9 Claims will be treated as Class 10 General Unsecured Claims. **The Trustee believes that there are no allowable Class 9 Claims that will receive Cash Distributions under the Plan.**

10.    **Class 10: General Unsecured Claims (Impaired).** Class 10 consists of all Allowed General Unsecured Claims. Each Holder of an Allowed Class 10 Claim shall receive a Pro Rata beneficial interest in the Liquidating Trust and a Pro Rata Distribution from the Net Proceeds of the liquidation of the Liquidating Trust Assets. Class 10 is Impaired and entitled to vote on the Plan. **The Trustee estimates that the allowable amount of Class 10 Claims will be significantly less that the asserted $50 million after the Liquidating Trustee's prosecution of Objections to Claims; the estimated distribution to Allowed General Unsecured Creditors is approximately 2-3% of their Allowed Claims.**

11.    **Class 11: Equity Interests (Impaired).** Class 11 consists of all Holders of Allowed Equity Interests in the Debtor. All Class 11 Equity Interests shall be canceled and extinguished as of the Effective Date, and the Holders thereof shall not be entitled to receive or

retain any Distributions or property on account of such Equity Interests. Class 11 is Impaired and not entitled to vote on the Plan.

**It is not possible to predict precisely the total amount of Claims in a particular Class or the Distributions that will be ultimately paid to Holders of Claims in the different Classes because of the variables involved in the calculations (including the results of the claims objection process). Notwithstanding, the estimates specified for each Class are based on information known to the Trustee and/or his Professionals as of the date of this Disclosure Statement.**

### E.    Assumption and Rejection of Executory Contracts under the Plan

**1.    Assumption.**  As of the Effective Date, each of those Executory Contracts designated by SkyValue in writing and identified in the Assumed Contracts Schedule (defined herein as the "Assumed Contracts"), which shall be filed with the Court and served upon each of the non-Debtor parties thereto not later than 10 days before the Confirmation Hearing, shall be deemed assumed by the Debtor and Reorganized Debtor pursuant to section 365(a) of the Bankruptcy Code, except as otherwise provided in Section 4.4 of the Plan. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption of the Assumed Contracts as of the Effective Date.

**2.    Rejection.**  Except for those Executory Contracts (a) that are assumed pursuant to Section 4.1 of the Plan, (b) that are the subject of prior orders of the Bankruptcy Court providing for their assumption or rejection pursuant to section 365 of the Bankruptcy Code, or (c) that are the subject of a pending motion before the Bankruptcy Court with respect to the assumption of such Executory Contracts, as of the Confirmation Date all Executory Contracts of the Debtor are deemed rejected pursuant to section 365 of the Bankruptcy Code.

**3.    Rejection Claims.**  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection of Executory Contracts being rejected pursuant to Section 4.2 of the Plan and section 365 of the Bankruptcy Code. Pursuant to Bankruptcy Rule 3002(4) and Local Rule 6006-1, any Rejection Claim must be filed with the Court within 30 days after the date of entry of the Confirmation Order, or such Claim will be forever barred and will not be enforceable against the Debtor, the Estate, the Reorganized Debtor, the Liquidating Trust or their respective assets, and no distribution pursuant to the Plan or otherwise will be made on account of such Claim. The Liquidating Trustee reserves all rights to object to any Rejection Claim, and any such objection shall be subject to the claims objection and administration procedures set forth in Section 6.1 of the Plan. All Allowed Rejection Claims shall be treated as Allowed Class 10 General Unsecured Claims

**4.    Cure Payments.**  Any monetary defaults under the Assumed Contracts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by either: (a) payment by the Reorganized Debtor of an undisputed Cure amount in Cash on or as soon as reasonably practicable after the Effective Date; or (b) payment by the Reorganized Debtor of an undisputed Cure amount on such other terms as may be agreed to by the Reorganized Debtor and the non-Debtor party to such Assumed Contract, or ordered by the Court. The Reorganized Debtor shall be solely liable for all Cure obligations in respect the Assumed Contracts; the pre-Effective Date

Debtor, the Trustee and the Liquidating Trust shall have no liability or obligation to pay any Cure amounts in respect of the Assumed Contracts.

The proposed Cure amount for each Assumed Contract will be listed on the Assumed Contracts Schedule that will be served upon each of the non-Debtor parties to the Assumed Contracts not later than 10 days prior to the Confirmation Hearing. Any objections to the proposed assumption of any Assumed Contract and/or proposed Cure amount associated therewith shall be filed with the Court and served upon the Trustee's counsel and SkyValue's counsel not later than the date that is two Business Days prior to the Confirmation Hearing. In the absence of a timely objection to any proposed Cure amount, such Cure amount shall be fixed as the Reorganized Debtor's Cure obligation for each corresponding Assumed Contract pursuant to section 365(b)(1) of the Bankruptcy Code, and the Confirmation Order shall constitute an Order approving such Cure obligation. In the event of any timely objection to the proposed assumption of an Assumed Contract and/or proposed Cure amount associated therewith, the Bankruptcy Court may consider such objection at the Confirmation Hearing or hold a separate hearing to consider such objection. In the event that the Bankruptcy Court determines that the Cure amount due in respect of any Assumed Contract is greater than the amount listed on the Assumed Contracts Schedule, or that any Assumed Contract is not assumable on terms and conditions acceptable to SkyValue and the Reorganized Debtor, then the Reorganized Debtor may, in its sole and absolute discretion, elect not to assume such Executory Contract by providing written notice to the non-Debtor party thereto. Any such Executory Contract shall be deemed rejected as of the Effective Date and any Rejection Claim with respect thereto must be filed within 30 days after the date of the written notice of non-assumption provided by the Reorganized Debtor, but otherwise is subject to the provisions of Section 4.3 of the Plan. To the extent necessary and appropriate, the Plan, accompanying Disclosure Statement and Assumed Contracts Schedule shall constitute a motion by the Trustee to assume the Assumed Contracts pursuant to section 365 of the Bankruptcy Code.

### F.    Exculpation, Injunction and Automatic Stay

**1.    Discharge.** Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for, and in complete satisfaction, discharge, and release of, all Claims and Equity Interests, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, Confirmation shall discharge the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent and/or the Liquidating Trust from any an all debts and/or Claims of any nature whatsoever against, as well as any Equity Interests in, the Debtor that arose prior to the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based on such debt has accepted the Plan.

Except as provided in the Plan or the Confirmation Order, as of the Effective Date all Persons shall be precluded from asserting against the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent and/or the Liquidating Trust, any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based upon any act, omission, transaction, or other

activity of any kind or nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of all Interests and other rights of equity security holders in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent and/or the Liquidating Trust to the extent that such judgment relates to a discharged Claim or Interest.

      **2.**    **Binding Effect.**  Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date the provisions of the Plan shall bind any Holder of a Claim against or Interest in the Debtor and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

      **3.**    **Stay.**  Unless otherwise provided herein, all injunctions or stays provided for in the Chapter 11 Case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the entry of the final decree closing the Chapter 11 Case.

      **4.**    <u>**Exculpation. Except as otherwise specifically provided in the Plan, the Trustee and the Committee, their officers, directors, employees, representatives, advisors, professionals, attorneys, financial advisors, or agents, or any of such parties' successors and assigns, shall not have or incur, and shall be released from, any claim, obligation, cause of action or liability to one another or to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, members, employees, representatives, advisors, attorneys, financial advisors, agents, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the pursuit of Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct, bad faith, breach of fiduciary duty or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.**</u>

      **5.**    **Injunction.**  Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date all Persons that have held, currently hold, or may hold, a Claim or other debt or liability that is discharged or an Equity Interest or other right of an equity security holder that is canceled or terminated pursuant to the terms of the Plan, and any successors, assigns or representatives of any of the foregoing, are permanently precluded and enjoined from taking any of the following actions on account of any such discharged Claims, debts or liabilities, or terminated or canceled Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent, the Liquidating Trust, the Liquidating Trustee, or the property or assets of any of the foregoing; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent, the Liquidating Trust, the Liquidating Trustee, or the property or assets of any of the foregoing; (c) creating, perfecting, or enforcing any lien or encumbrance against the

Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent, the Liquidating Trust, the Liquidating Trustee, or the property or assets of any of the foregoing; (d) asserting a right of subordination, setoff, recoupment or counterclaim of any kind against any debt, liability, or obligation due to the Debtor, the Estate, the Reorganized Debtor, the Disbursing Agent, the Liquidating Trust, the Liquidating Trustee, or the property or assets of any of the foregoing; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Nothing in the Plan or Confirmation Order shall enjoin or preclude the United States from pursuing any police or regulatory action against the Debtor or Reorganized Debtor to the extent that any such police or regulatory action is not of the nature that is stayed under 11 U.S.C. § 362(a) and is the type of action that is excepted from the automatic stay under 11 U.S.C. § 362(b)(4).

<h2 style="text-align:center">ARTICLE VIII<br>MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN</h2>

### A.    Stock Issuance and Plan Funding Agreement.

Essentially, the Stock Issuance and Plan Funding Agreement contemplates SkyValue acquiring 100% of the capital stock of the Reorganized Debtor, evidenced by the Reorganized Falcon Air Shares to be issued on the Closing Date, in exchange for cash consideration that will be used to fund payments to Allowed Creditors under the Plan. A copy of the Stock Issuance and Plan Funding Agreement, which was executed by and between the Trustee and SkyValue on February 9, 2007, is attached to the Plan as Exhibit A. The significant features of the Stock Issuance and Plan Funding Agreement are described in Article VI.J. above.

### B.    Vesting of Assets in Reorganized Falcon Air and Continued Corporate Existence.

On the Effective Date, all Assets and Property of the Debtor and the Estate, except for those Excluded Assets which shall be transferred to the Liquidating Trust on the Effective Date, shall vest in the Reorganized Debtor free and clear of all Claims, liens, interests and encumbrances that arose prior to the Closing Date, except as otherwise provided in the Plan or Liquidating Trust Agreement. The Reorganized Debtor, as owned and controlled by SkyValue pursuant to the Stock Issuance and Plan Funding Agreement, will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under applicable law in the jurisdiction in which the Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect before the Effective Date, as such documents are amended by or pursuant to the Plan. Notwithstanding, the Reorganized Debtor may change its status of incorporation or formation or alter its corporate structure (either through mergers, consolidations, restructurings, conversions, dispositions, liquidations, dissolutions, or otherwise) after the Effective Date as may be determined by the Reorganized Debtor to be appropriate in connection with the conduct of its business.

### C.    Management of Reorganized Debtor.

Unless otherwise provided in the Confirmation Order or in a notice that shall be filed

with the Bankruptcy Court at least five (5) days before the Confirmation Hearing, Reorganized Falcon Air's board of directors as of the Effective Date, all U.S. citizens, shall consist of Darrell Richardson (also president and chief executive officer), Joseph Mott, Mark Rodgers and Thomas Catania, while the Debtor's current directors (the "five wisemen"), whose *curricula vitae* are attached hereto as composite Exhibit 2, shall continue with Reorganized Falcon Air on and after the Effective Date. Additionally, all current employees of Falcon Air as of the Effective Date will be employed by the Reorganized Debtor on the Effective Date.

### D.     Creation of the Liquidating Trust.

In accordance with Article V of the Plan and the Liquidating Trust Agreement, the Liquidating Trust will be created as of the Effective Date for the purpose of liquidating the Liquidating Trust Assets for the benefit of General Unsecured Creditors. The salient provisions of the Liquidating Trust Agreement are described below.

**1.     General.** Pursuant to the Plan, the Debtor and Trustee shall create the Liquidating Trust. The Liquidating Trust Agreement, substantially in the form attached to the Plan as Exhibit B, shall be executed by all necessary parties thereto and shall be filed with the Bankruptcy Court on the Effective Date.

**2.     Transfer of Excluded Assets to the Liquidating Trust.** On the Effective Date, the Debtor shall transfer and convey the Excluded Assets to the Liquidating Trust free and clear of all Claims, liens, interests and encumbrances, except as expressly provided in the Plan, and shall be held, maintained and administered solely and exclusively by the Liquidating Trustee. The Liquidating Trust Assets shall consist of the Excluded Assets, which will not vest in the Reorganized Debtor. The Debtor, SkyValue, the Reorganized Debtor and Liquidating Trustee shall be authorized and directed to execute any and all documents necessary to effectuate the transfer of the Liquidating Trust Assets. The Liquidating Trustee shall have sole and exclusive standing and authority to commence, prosecute, settle or otherwise dispose of the Debtor's Causes of Action transferred to the Liquidating Trust under the Plan.

The Liquidating Trust Assets will include, without limitation, the Debtor's Causes of Action and Avoidance Actions, and all of the Debtor's Cash on hand as of the Effective Date.

**3.     Designation of Liquidating Trustee.** Kenneth A. Welt shall serve as the Liquidating Trustee, with such appointment to become effective as of the Effective Date. Mr. Welt shall secure a bond for the benefit of the Liquidating Trust in an amount that is satisfactory to the U.S. Trustee. As of the Effective Date, the Liquidating Trustee shall have sole authority to act on behalf of the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement. Mr. Welt currently serves as the Chapter 11 Trustee for Falcon Air and, has extensive knowledge of the business, assets and financial affairs of Falcon Air and is well qualified to serve as Liquidating Trustee. Mr. Welt also has substantial experience as a panel trustee for the Southern District of Florida and frequently appears before the Bankruptcy Court. In fact, Mr. Welt has administered over 30,000 chapter 7 or 11 bankruptcy cases. Mr. Welt's credentials are described in detail on the following website: www.kawpa.com.

4.     **Purpose of Liquidating Trust.** The Liquidating Trust established pursuant to the Liquidating Trust Agreement is established for the purpose of liquidating the Liquidating Trust Assets for the benefit of Allowed General Unsecured Creditors under the Plan, including the prosecution of Causes of Action and Objections to Claims, as appropriate. The Liquidating Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to comply with, and consistent with, the purpose of the Liquidating Trust.

5.     **Compensation of Liquidating Trustee and Professionals.** Mr. Welt, as Liquidating Trustee or Disbursing Agent, shall be compensated pursuant to the statutory formula delineated in section 326(a) of the Bankruptcy Code, and shall be authorized to pay himself compensation and reimburse himself for expenses on a monthly basis; provided, however, that the original Cash transferred to the Liquidating Trust shall not be included in calculating the Liquidating Trustee's compensation. The members of the Post-Confirmation Committee shall receive no compensation for their services but may request reimbursement for reasonable out-of-pocket expenses incurred in performance of their duties.

Upon the Effective Date, the employment of all Professionals retained by the Debtor, Trustee or Committee pursuant to 11 U.S.C. §§ 327, 328 or 1103 shall be terminated without further Court order. Professionals retained by the Liquidating Trustee and the Post-Confirmation Committee shall file applications for retention in accordance with the standards set forth by the Bankruptcy Code and the Bankruptcy Rules; Professionals retained by the Trustee or Committee during the Chapter 11 Case, however, need not file retention applications. No more frequently than once every thirty (30) days, the Liquidating Trustee's counsel and any other Professional retained by the Liquidating Trustee and the Post-Confirmation Committee shall submit his, her or its statement(s) for services rendered and costs incurred to the Liquidating Trustee and the Post-Confirmation Committee for review and approval. The statements do not need to conform to the U.S. Trustee's guidelines for fee applications, but must contain adequate information to enable review the reasonableness of the statements. The Post-Confirmation Committee and the Liquidating Trustee shall have ten (10) days to object to any such statement. If no objection is served upon the Professional in respect of any such statement, then the Liquidating Trustee shall promptly pay the fees and costs reflected in such statement. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute with respect to such statements or any Professional's fees.

6.     **Liquidating Trust Reserve.** The Liquidating Trustee shall be authorized and directed to maintain in a Liquidating Trust Reserve, Cash necessary to (a) pay the actual and anticipated Liquidating Trust Expenses, (b) fund the Disputed Claims Reserve, and (c) pay Holders of Allowed Claims whose Cash Distributions are unclaimed, subject to the terms of Section 8.8 of the Plan. Any funds remaining in the Liquidating Trust Reserve immediately prior to the Final Distribution shall be included in the Final Distribution unless earmarked for payment of Liquidating Trust Expenses. On the Effective Date, the amount of $200,000 will be transferred from the Estate to the Liquidating Trust earmarked to fund Liquidating Trust Expenses; no portion of this amount will become available for Distribution to Allowed General Unsecured Creditors under the Plan and Liquidating Trust Agreement unless and until the Liquidating Trust Expenses are paid in full.

46

## ARTICLE IX
## FEASIBILITY

### A.    Plan Payments

Based upon the anticipated Allowed amounts of Administrative, Priority and Secured Claims, and subject to certain risk factors discussed in Article X hereof, the Trustee believes that the SkyValue Cash Consideration payable on Effective Date, in addition to the Debtor's Cash on hand as of the Effective Date, will be sufficient to satisfy the Estate's "Effective Date" payment obligations under the Plan by paying all such Claims in full, or establishing a sufficient reserve as part of the Disputed Claims Reserve to pay all such Claims in full. Payment of the SkyValue Cash Consideration under the Stock Issuance and Plan Funding Agreement is a condition precedent to the effectiveness of the Plan.

### B.    Reorganized Debtor and Business Plan

SkyValue is a newly-formed Florida corporation established for the purpose of purchasing the stock of Reorganized Falcon Air, owned 90% by C First Class Corp. and 10% by the Agesis Group.

After the Closing and Effective Date, SkyValue USA, a wholly-owned subsidiary of C First Corp of Ft. Lauderdale, will be merged into SkyValue. Falcon Air will be renamed Sky Value Airlines. Both SkyValue USA, which is currently an indirect air carrier, and Falcon Air, which is currently a direct air carrier, will be combined to form the new airline.

The following excerpt regarding the Reorganized Debtor's proposes business plan, emphasized in *italics*, is provided by SkyValue and the Trustee makes no representations regarding the accuracy of the following statements:

*Sky Value, a US DOT approved Tour Operator (indirect air carrier), is a d/b/a of C First Class Corporation and operates flights between Gary Chicago International Airport and Las Vegas, Orlando, St. Petersburg and Phoenix. Sky Value contracts with Xtra Airways to provide aircraft & crews for the flights. Xtra Airways is a competitor of Falcon Air Express and both airlines provide similar services to tour operators like Sky Value.*

*By combining Sky Value and Falcon Air Express we plan on creating a new low cost scheduled and charter airline. After the combination we plan on expanding by adding up to six MD80 aircraft over the first eighteen months.*

*The combination of Sky Value & Falcon Air Express will create a new and exciting low cost airline based at the Miami International Airport to serve the existing Sky Value routes out of Gary Chicago International Airport. In addition to those routes the new airline will continue to develop the charter market to support tour operators and provide transportation to both professional and collegiate sports teams as well as the United States Military.*

Information regarding the existing charter business and charter routes operated by Sky Value USA can be found at www.flyskyvalue.com.

SkyValue has represented to the Trustee that it will be able to fully perform under the Stock Issuance and Plan Funding Agreement. To the extent necessary, SkyValue's president and chief executive officer, Darrell Richardson, will be available to testify at the Confirmation Hearing regarding this or any other issue involving SkyValue.

## ARTICLE X
## RISK FACTORS

Creditors should carefully consider the following factors, as well as the other information contained in this Disclosure Statement (as well as the documents delivered herewith or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

The principal purpose of the Chapter 11 Case is the formulation of the Plan, which reorganizes the Debtor's business and operations and establishes how Claims against and Equity Interests in the Debtor will be satisfied. Under the Plan, certain Claims may receive partial distributions, and other Claims may not receive any distributions at all. Equity Interests will receive no distributions. The recapitalization of the Debtor pursuant to the Plan realizes the going concern value of the Debtor for the benefit of the Holders of Claims and Equity Interests. Moreover, reorganization of the Debtor's business and operations under the proposed Plan avoids the potentially adverse impact of liquidation on the Debtor's employees, as well as their customers, trade vendors, suppliers of goods and services, and lessors.

### A.    Failure to Confirm or Consummate the Plan

If the Plan is not confirmed and consummated, it is possible that an alternative plan can be negotiated and presented to the Bankruptcy Court for approval, however, there is no assurance that the alternative plan will be confirmed, that the Chapter 11 Case will not be converted to a liquidation, or that any alternative plan of reorganization could or would be formulated on terms as favorable to the Creditors as the terms of the Plan. Interestholders will receive no recovery under the Plan or in a liquidation. If a liquidation or protracted reorganization were to occur, there is a risk that there would be little, if any, value available for distribution to the Holders of Claims and Equity Interests. If the Trustee and the IRS do not reach an agreement regarding the treatment of the IRS Claim, the Plan as presently drafted is not confirmable. If the DOJ Trust Fund Claims, consisting of trust fund fee claims in a total amount exceeding $1.2 million, are allowed in full there may be insufficient Cash in the Estate to pay such Claims; the Plan, therefore, may not be confirmed.

### B.    Allowed Claims Estimates May Be Incorrect

There can be no assurance that the estimated Allowed Claim amounts set forth herein are correct. The actual Allowed amounts of Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions, and if one or more of such risks or uncertainties materialize, or if underlying assumptions prove incorrect, the actual allowed amounts of Claims may vary from those estimated herein.

### C.      Competitive Conditions in the Airline Industry

The airline industry and the markets for the Debtor's products and services are extremely competitive, and the Reorganized Debtor faces competition from a great number of sources with greater resources.  Some or all of these industry competitors are experiencing financial difficulty and may respond to their financial difficulties by reducing prices on their services to increase or retain market shares.  Some of these competitors have substantially greater financial and other resources than the Reorganized Debtor.  There can be no assurance that competitive pressures will not materially adversely affect the Reorganized Debtor's business, financial condition or results of operations.

### D.      Increase in Oil Prices or Oil Shortages

Aviation fuel is one of the most significant expenses for an airline.  The price of aviation fuel is directly influenced by the price of crude oil, which is influenced by a wide variety of macroeconomic and geopolitical events and is completely beyond the control of the Reorganized Debtor.  Historically, the Debtor attempted to pass on increases in the price of aviation fuel to its customers through the imposition of a surcharge, but had to bear a portion of price increases over the short term.  There can be no assurance that the Reorganized Debtor will be able to continue to impose such surcharge in the future.  ACMI contracts required the Debtor's customers to pay for aviation fuel.  If the price of aviation fuel increases, such customers may not use the plane subject to such ACMI contract, which could adversely affect the financial performance of the Reorganized Debtor if it continues to operate the business under ACMI contracts.  Additionally, hostilities in the Middle East and terrorist attacks in the United States and abroad could cause significant disruptions in the supply of crude oil and have a large impact on the price of fuel.

### E.      Regulation of Airline Industry

The commercial aviation business is highly regulated, and the imposition of new or modified regulations can have a significant impact on the Reorganized Debtor.  New regulations relating to environmental, safety, security and scheduling matters may be considered by various governmental agencies.  The adoption of such regulations could cause increased operating expenses and in some cases restrictions on the operations of airlines, including the Reorganized Debtor, which could have a material adverse effect on the Reorganized Debtor's financial condition, cash flow and results of operations.

## ARTICLE XI
## ALTERNATIVES TO PLAN AND BEST INTERESTS OF CREDITORS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Chapter 11 Case, (b) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by the Trustee or another party.

A.    **Dismissal**

The most remote possibility is dismissal. If the Chapter 11 Case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal would force a race among creditors to take over and dispose of the Debtor's available assets. Even the most diligent unsecured creditors would likely fail to realize any significant recovery on their claims.

B.    **Chapter 7 Liquidation**

A straight liquidation bankruptcy, or chapter 7 case, requires liquidation of the bankruptcy debtor's assets by an impartial trustee. In a chapter 7 case, the amount that unsecured creditors would receive depends on the net estate available after all assets of the debtor have been reduced to cash. The cash realized from liquidation of the debtor's assets would be distributed in accordance with the priority and distribution scheme prescribed in Bankruptcy Code section 507.

If the Plan is not confirmed, it is likely that the Chapter 11 Case will be converted to a case under chapter 7 of the Bankruptcy Code, in which case a trustee would be appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is a case under chapter 7 or chapter 11, Secured Claims, Administrative Claims and Priority Claims are entitled to be paid in full before unsecured creditors receive any funds.

If the Chapter 11 Case were converted to chapter 7, the present Administrative Claims may have a priority lower than priority claims generated by the chapter 7 case, such as the chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the chapter 7 trustee.

If the Chapter 11 Case were converted, the Bankruptcy Court would appoint a trustee to liquidate the Debtor's property and assets and distribute the proceeds to creditors in accordance with the Bankruptcy Code's priority scheme. It is likely that the chapter 7 trustee would have little or no experience or knowledge of the Debtor's businesses or their records or assets. A substantial period of education would be required in order for any chapter 7 trustee to wind the case up effectively.

The chapter 7 trustee would be entitled to receive the compensation allowed under Bankruptcy Code section 326. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1 million; and reasonable compensation not to exceed 3% of any amount in excess of $1 million, on all funds disbursed or turned over in the bankruptcy case by the trustee to parties in interest (excluding the Debtor, but including the holders of Secured Claims). The trustee's compensation would be paid as a cost of administration of the chapter 7 estate, and may have priority over the costs and expenses incurred in the chapter 11 case and any payment to unsecured creditors.

It is also likely that the chapter 7 trustee would retain his own professionals (including attorneys and financial advisors) whose fees would also constitute administrative priority claims

in the chapter 7 case, with a priority that may be higher than those claims arising as part of the administration of the chapter 11 case.

The Trustee believes that liquidation under chapter 7 would result in no cash distributions being made to Creditors other than the IRS and DOJ. As previously noted, conversion to chapter 7 would give rise to (a) additional administrative expenses involved in the appointment of a trustee and attorneys' and other professionals to assist such trustee and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's business operations.

In a chapter 7 liquidation of Falcon Air, general unsecured creditors would likely receive no distributions on account of their claims since the IRS Secured Claim, in the total amount of approximately $7.7 million, would encumber all of the Estate's assets leaving the estate administratively insolvent and no funds available for distribution to unsecured creditors. Additionally, the Trustee believes that the IRS would receive substantially less in a chapter 7 liquidation.

Accordingly, the Proponents believe that the Plan is in the best interests of creditors for purposes of section 1129(a)(7) of the Bankruptcy Code.

### C.    Alternative Plan

Since the "exclusivity period" under section 1121(b) of the Bankruptcy Code terminated upon the appointment of the Trustee, any other creditor or party in interest may file a chapter 11 plan. The Trustee believes, however, that the treatment proposed to General Unsecured Creditors herein is likely more favorable to any alternatives that could be proposed by way of a "competing plan" or otherwise.

### ARTICLE XII
### TAX CONSIDERATIONS

### A.    In General

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Plan for the Debtor and for the holders of Allowed Claims and Equity Interests who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder, and judicial decisions and administrative rulings and pronouncements of

the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

This discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the U.S. federal tax consequences of the Plan to special classes of taxpayers (such as foreign entities, nonresident alien individuals, Pass-through entities such as partnerships and holders through such pass-through entities, S corporations, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, certain securities traders, broker-dealers and tax-exempt organizations). Furthermore, estate and gift tax issues are not addressed herein and tax consequences relating to the alternative minimum tax are generally not discussed herein.

No representations are made regarding the particular tax consequences of the Plan to any Holder of a Claim or Equity Interest. Each Holder of a Claim or Equity Interest is strongly urged to consult its own tax advisor regarding the federal, state, local and foreign tax consequences of the transactions described herein and in the Plan.

## B.     Federal Income Tax Consequences to the Debtor

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of debt ("COD") income, which must be included in the debtor's income. The Debtor should have COD income as a result of the Plan; the Debtor should, however, be able to utilize a special tax provision which excludes from taxable income debts discharged in a chapter 11 case. If debts are discharged in a chapter 11 case, however, certain tax attributes otherwise available must be reduced by the amount of COD income that is excludable from income. Tax attributes subject to reduction generally include net operating losses and net operating loss carryovers (collectively, "NOLs"). Any NOLs would be reduced (assuming the Debtor does not make an election pursuant to section 108(b)(5) of the Internal Revenue Code (title 26 of the United States Code) to first reduce the tax basis of depreciable property) to the extent of the COD income exclusion. The Trustee believes it is likely that the COD income generated by the debt cancellation occurring pursuant to the Plan will offset the available NOLs generated prior to the Effective Date (although such NOLs, which may be subject to usage limitations under section 382 of the Tax Code, would first be permitted to offset any taxable income generated in the tax year that includes the Effective Date).

Federal income taxes generally must be satisfied before most other claims may be paid. To the extent the Debtor has taxable income after the Effective Date, the Debtor may have NOLs to offset such income.

### C.    Federal Income Tax Consequences to Creditors

Creditors should generally recognize gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) the nature and origin of the Claim, (ii) the manner in which a Creditor acquired a Claim, (iii) the length of time a Claim has been held, (iv) whether the Claim was acquired at a discount, (v) whether the Creditor has taken a bad debt deduction in the current or prior years, (vi) whether the Creditor has previously included in income accrued but unpaid interest with respect to a Claim, (vii) the method of tax accounting of a Creditor; and (viii) whether a Claim is an installment obligation for U.S. federal income tax purposes. Therefore, Creditors should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequence to such Creditors as a result thereof.

The tax treatment of a Creditor that receives distributions in different taxable years is uncertain. If such a Creditor treats the transaction as closed in the taxable year that it first receives (or is deemed to have received) a distribution of cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its Claim (except to the extent its Claim is for accrued interest). A Creditor should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the Creditor's allocable tax basis in its Claim with respect to such subsequent distribution. A Creditor may have to treat a portion of any such subsequent distribution as imputed interest recognizable as ordinary income in accordance with the Creditor's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the Subsequent Distributions that a Creditor may receive not being ascertainable on the Closing Date or the Effective Date, such Creditor should not recognize gain (except to the extent that the value of the cash and/or other property already received exceeds such Creditor's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon (which may not be until the Final Distribution Date). It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases. The Trustee believes that the open transaction doctrine should not apply and that holders may be entitled to take the position that on the Closing Date and on the Effective Date no value should be assigned to the right to receive any Subsequent Distributions. Creditors are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Creditors may be treated as paying to other Creditors.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in

accordance with the Holder's method of accounting for tax purposes, to the extent that any cash and/or other property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash and/or other property should be attributable to accrued but unpaid interest is unclear. The Plan provides, and the Trustee intends to take the position, that such cash and/or other property distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Creditor should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A Creditor generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

### D.    Holders of Allowed Equity Interests

The Holders of Allowed Equity Interests in the Debtor are urged to consult with their tax advisors with respect to the tax consequences under the Plan. The Holders of Allowed Equity Interests and their advisors may wish to consider, among any other relevant considerations, the extent to which the Holder of an Allowed Equity Interest may be entitled to a bad debt deduction or a worthless security loss in respect of the cancellation of its shares of the Debtor's common stock under the Plan.

### E.    Holders of Disputed Claims

Though not beyond doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the assets are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such claimant (other than any amounts attributable to accrued and unpaid interest) less (ii) the adjusted tax basis of its Claim (other than for accrued and unpaid interest). Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.

### F.    Information Reporting and Backup Withholding

Certain payments, including payments of Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of federal income taxes, a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

G.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CREDITOR'S INDIVIDUAL CIRCUMSTANCES.    ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE XIII**
**CONCLUSION**

This Disclosure Statement provides information regarding the Debtor's bankruptcy and the potential benefits that might accrue to Holders of Claims against and Equity Interests in the Debtor under the Plan as proposed. The Plan is the result of extensive efforts by the Trustee and its advisors to provide the Holders of Allowed Claims and Equity Interests with a meaningful dividend. The Proponents believe that the Plan is feasible and will provide each Holder of a Claim against and Equity Interest in the Debtor with an opportunity to receive greater benefits than those that would be received by any other alternative. The Proponents, therefore, urges eligible Creditors to vote in favor of the Plan.

[SIGNATURE PAGE FOLLOWS]

Dated:  February 9, 2007

Respectfully submitted,

KENNETH A. WELT,              -and-        SKYVALUE AIRLINES, INC.
CHAPTER 11 TRUSTEE
FOR FALCON AIR EXPRESS, INC.

By:_____                By:_____
     Kenneth A. Welt                             F. Darrell Richardson

          -and-                                        -and-

**KATZ BARRON SQUITERO FAUST**             **RICE PUGATCH ROBINSON &**
*Attorneys for Chapter 11 Trustee*         **SCHILLER, P.A.**
2699 South Bayshore Drive, 7th Floor  *Attorneys for Skyvalue Airlines, Inc.*
Miami, Florida 33133                       Lisa M. Schiller, Esq.
Telephone: (305) 856-2444                  101 N.E. 3rd Avenue, Suite 1800
Facsimile: (305) 285-9227                  Tower 101
                                           Ft. Lauderdale, Florida 33301
                                           Telephone: (954) 462-8000
                                           Facsimile: (954) 462-4300

By: /s/ Frank P. Terzo_____        By: /s/ Lisa M. Schiller_____
     Frank P. Terzo                             Lisa M. Schiller
     Fla. Bar No. 906263                        Fla. Bar No. 984426
     Nathan G. Mancuso
     Fla. Bar No. 174254

Dated: February 9, 2007

Respectfully submitted,

**KENNETH A. WELT,**      -and-     **SKYVALUE AIRLINES, INC.**
**CHAPTER 11 TRUSTEE**
**FOR FALCON AIR EXPRESS, INC.**

By: _____      By: *Darrell Richardson*
    Kenneth A. Welt                   F. Darrell Richardson

       -and-                         -and-

**KATZ BARRON SQUITERO FAUST**     **RICE PUGATCH ROBINSON &**
*Attorneys for Chapter 11 Trustee*     **SCHILLER, P.A.**
2699 South Bayshore Drive, 7th Floor    *Attorneys for Skyvalue Airlines, Inc.*
Miami, Florida 33133              Lisa M. Schiller, Esq.
Telephone: (305) 856-2444        101 N.E. 3rd Avenue, Suite 1800
Facsimile: (305) 285-9227        Tower 101
                               Ft. Lauderdale, Florida 33301
                               Telephone: (954) 462-8000
                               Facsimile: (954) 462-4300

By: /s/ Frank P. Terzo_____      By: /s/ Lisa M. Schiller_____
    Frank P. Terzo                    Lisa M. Schiller
    Fla. Bar No. 906263             Fla. Bar No. 984426
    Nathan G. Mancuso
    Fla. Bar No. 174254

56